LEICHTAMER ET AL., APPELLEES, *v.*
AMERICAN MOTORS CORP. ET AL., APPELLANTS.

[Cite as Leichtamer v. American Motors Corp. (1981),
67 Ohio St. 2d 456.]

(No. 80-1354—Decided August 5, 1981.)

*Messrs. Okey & Casale, Mr. Eugene P. Okey* and *Mr. Mark D. Okey,* for appellees.

*Messrs. Weston, Hurd, Fallon, Paisley & Howely, Mr. Andrew P. Buckner* and *Mr. Louis Paisley,* for appellants.

WILLIAM B. BROWN, J.

### I(A).

Appellants' first three propositions of law raise essentially the same issue: that only negligence principles should be applied in a design defect case involving a so-called "second collision." In this case, appellees seek to hold appellants liable for injuries "enhanced" by a design defect of the vehicle in which appellees were riding when an accident occurred. This cause of action is to be contrasted with that where the alleged defect causes the accident itself. Here, the "second collision" is that between appellees and the vehicle in which they were riding.

Appellants assert that the instructions of law given to the jury by the trial court improperly submitted the doctrine of strict liability in tort as a basis for liability. The scope of this review is limited to the question of whether an instruction on strict liability in tort should have been given. For the reasons explained herein, we answer the question in the affirmative.

### I(B).

The appropriate starting point in this analysis is our decision in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317. In *Temple,* this court adopted Section 402A of the Restatement of Torts 2d, thus providing a cause of action in strict liability for injury from a product in Ohio. Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his

property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Section 402A was applied to an action in which the plaintiff-appellant was injured while operating a punch press. While she acknowledged the absence of any mechanical malfunction in the press, plaintiff-appellant contended that the punch press was defective in that it was unreasonably dangerous and was placed in the hands of the user without adequate warning. In affirming the granting of a motion for summary judgment in favor of the punch press manufacturer, we found that the record revealed substantial change in the product subsequent to sale, thus removing the cause from Section 402A strict liability analysis. We further considered, and rejected, plaintiff-appellant's claim of negligent design, concluding that in view of the Industrial Commission's Safety Code, the manufacturer had exercised reasonable care in the design of the punch press.

*Temple* is significant in that it presents two alternate phrasings of the test for recovery under a theory of strict liability in tort. The first is whether a product is " 'of good and merchantable quality, fit and safe for***[its] ordinary intended use.' " *Temple* v. *Wean United, Inc., supra,* at page 321. The other is the "unreasonably dangerous" test of Section 402A of the Restatement of Torts 2d. *Id.,* at paragraph one of the syllabus. We recognized in *Temple,* at page 322, that "there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort***." Thus, in Ohio, a product which is unfit and unsafe for its intended use under an "implied warranty in tort" theory, would also be unreasonably dangerous under Section 402A theory. Before moving to an exploration of what would

constitute an "unreasonably dangerous" design defect, under the Restatement, it is necessary to address the threshold question of whether Section 402A analysis should apply to design defects involving a "second collision."

Dean Prosser, reporter for the Restatement of Torts 2d, raised a cloud of doubt over the applicability of Section 402A to design cases with his comment: "***There are, in addition, two particular areas in which the liability of the manufacturer, even though it may occasionally be called strict, appears to rest primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence.

"One of these involves the design of the product, which includes plan, structure, choice of materials and specifications. [Footnotes omitted.]" Prosser on Torts (4 Ed.), 644-645, Section 96. See Section 398 of Restatement of Torts 2d, Chattel Made Under a Dangerous Plan or Design, which sets a negligence standard for defective design.

Nevertheless, the vast weight of authority is in support of allowing an action in strict liability in tort, as well as negligence, for design defects. See Annotation, 96 A.L.R. 3d 22, Sections 3-6. We see no difficulty in also applying Section 402A to design defects. As pointed out by the California Supreme Court, "[a] defect may emerge from the mind of the designer as well as from the hand of the workman." *Cronin* v. *J.B.E. Olson Corp.* (1972), 8 Cal. 3d 121, 134, 104 Cal. Rptr. 433. A distinction between defects resulting from manufacturing processes and those resulting from design, and a resultant difference in the burden of proof on the injured party, would only provoke needless questions of defect classification, which would add little to the resolution of the underlying claims. A consumer injured by an unreasonably dangerous design should have the same benefit of freedom from proving fault provided by Section 402A as the consumer injured by a defectively manufactured product which proves unreasonably dangerous.

The doctrine of strict liability evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product. *Greenman* v. *Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 27 Cal. Rptr. 697. Any distinction based upon the source of the defect undermines the policy underlying the doctrine that the public

interest in human life and safety can best be protected by subjecting manufacturers of defective products to strict liability in tort when the products cause harm.

Strict liability in tort has been applied to design defect "second collision" cases. *Brandenburger* v. *Toyota Motor Sales, U.S.A., Inc.* (1973), 162 Mont. 506, 513 P. 2d 268; *Seattle-First Nat. Bank* v. *Volkswagen of America, Inc.* (1974), 11 Wash. App. 929, 525 P. 2d 286; Annotation, 42 A.L.R. 3d 560. While a manufacturer is under no obligation to design a "crash proof" vehicle, *Larsen* v. *General Motors* (C.A. 8, 1968), 391 F. 2d 495, an instruction may be given on the issue of strict liability in tort if the plaintiff adduces sufficient evidence that an unreasonably dangerous product design proximately caused or enhanced plaintiff's injuries in the course of a foreseeable use. *Dyson* v. *General Motors Corp.* (D.C. E.D. Pa. 1969), 298 F. Supp. 1064. Here, appellants produced a vehicle which was capable of off-the-road use. It was advertised for such a use. The only protection provided the user in the case of roll-overs or pitch-overs proved wholly inadequate. A roll bar should be more than mere ornamentation. The interest of our society in product safety would best be served by allowing a cause in strict liability for such a roll bar device when it proves to be unreasonably dangerous and, as a result enhances the injuries of the user.

### I(C).

We turn to the question of what constitutes an unreasonably dangerous defective product.

Section 402A subjects to liability one who sells a product in a "defective condition unreasonably dangerous" which causes physical harm to the ultimate user. Comment *g* defines defective condition as "a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him." Comment *i* states that for a product to be unreasonably dangerous, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

With regard to design defects, the product is considered defective only because it causes or enhances an injury. "In such a case, the defect and the injury cannot be separated, yet

clearly a product cannot be considered defective simply because it is capable of producing injury." Kimble & Lesher, Products Liability, at page 80. Rather, in such a case the concept of "unreasonable danger" is essential to establish liability under strict liability in tort principles.

The concept of "unreasonable danger," as found in Section 402A, provides implicitly that a product may be found defective in design if it is more dangerous in use than the ordinary consumer would expect. Another way of phrasing this proposition is that "a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Barker* v. *Lull Engineering Co., Inc.* (1978), 20 Cal. 3d 413, 429, 143 Cal. Rptr. 225.[1] As the California Supreme Court pointed out, such a standard is somewhat analogous to the commercial law warranty of fitness and merchantability. *Id.* As stated, *supra,* this court has previously recognized a definition of product defect also based upon an analogy to commercial warranty. *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, at page 235; *Temple* v. *Wean United, supra,* at page 321. This standard reflects the commercial reality that "[i]mplicit in***[a product's] presence on the market***[is] a representation that it [will] safely do the jobs for which it was built." *Greenman* v. *Yuba Power Products, supra,* at page 64.

Moreover, a consumer-expectation test of unreasonable

---

[1] *Barker, supra,* also provides, at page 430, an alternate test by which a product may be found defective in design even if it satisfies ordinary consumer expectations. Liability would result "***if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." In evaluating a product's design pursuant to the "risk-benefit" standard, a jury is permitted to consider "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. *Barker, supra,* at page 431. The court further determined that a manufacturer which seeks to escape liability for an injury proximately caused by its product's design on a risk-benefit theory should bear the burden of persuading the trier of fact that its product should not be judged defective, rather than simply the burden of producing evidence. *Id.,* at pages 431-432. The appropriateness of this additional test was not raised by either party and we express no position thereon.

danger recognizes the legitimacy of one of the fundamental values in the law of torts: "the protection of the individuality of persons, by according formal respect for their fairly developed expectations of product safety***." Owen, Rethinking the Policies of Strict Products Liability, 33 Vanderbilt L. Rev. 681, at page 690.

Thus, we hold a cause of action for damages for injuries "enhanced" by a design defect will lie in strict liability in tort. In order to recover, the plaintiff must prove by a preponderance of the evidence that the "enhancement" of the injuries was proximately caused by a defective product unreasonably dangerous to the plaintiff.

A product will be found unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably foreseeable manner.[2]

---

[2] The trial judge gave the following instructions:

"Now this leaves for your determination the disputed issues which may be summarized as follows:

"1. Did the defendant breach its implied warranty to the plaintiff that its product was free of defect in design and reasonably safe for the use for which it was intended?

"2. Did the defendant breach its implied warranty to plaintiff in failing to warn the plaintiff that its unit was defective in design and likely to cause harm to persons using it?
"***

"4. Did the defect in design of the product and/or the defendant's failure to warn the plaintiff that its unit was defective and likely to cause harm to persons using it proximately cause or enhance the injury and damage, if any, sustained by the plaintiff?
"***

"***The doctrine of 'breach of implied warranty' as charged in the complaint does not depend upon proof of fault. A claim predicated upon breach of implied warranty proceeds upon a legal theory that one who provides a product impliedly represents to consumers or users of that product that it is a good or sound product. In the event it should thereafter develope [sic] that the product was not a sound or good product and a consumer or user thereof sustains an injury due to a defect therein, the manufacturer has breached its implied warranty.

"To recover for a breach of implied warranty, to provide a product free of defect in design and reasonably safe for the use for which it was intended, a plaintiff need not prove that any part of the product broke, fell apart, wore out or malfunctioned. The issue is not the degree of care exercised in the design and manufacture of the product, but rather the degree of safety of the ultimate product itself. I caution you, however, that the issue of breach of implied warranty—sometimes referred to by lawyers as the doctrine of strict liability—does not create absolute liability on the manufacturer of the product. Liability of the manufacturer may not be presumed from the mere happening

## II.

Appellants' proposition of law No. 5 asserts, in part, that "[a]n instruction to the jury that the manufacturer's failure to warn is a breach of an implied warranty and renders the manufacturer strictly liable is error." The trial court instructed the jury that appellees had the burden of proving by a preponderance of the evidence that: "Defendant breached its implied warranty to plaintiff in failing to warn plaintiff that its unit was defective in design and likely to cause harm to persons using it; and***[t]he defect in the design of the product and the failure to warn the plaintiff as above indicated proximately caused or enhanced the injury and damage, if any, sustained by the plaintiff."

Comment *j* to Section 402A of the Restatement of Torts 2d, in part, states: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." Comment *j* further states: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

In light of our adoption of Section 402A "***together

---

of an accident. Accidents can happen in the use of any product, be it basically a safe or unsafe one.
"***

"The phrases 'design defect,' 'defective design' and others of like import as used herein is a fault or imperfection in design, which fault of [*sic*] imperfection in design exposes the user of a product made from such design to a hazard or danger beyond that which would be contemplated by an ordinary user with the knowledge common to persons using such product as to its characteristics. Thus under this doctrine it is the duty of a manufacturer, such as the defendant, to design a product that is reasonably fit for the use for which it is intended. A product is not considered as reasonably fit for the use for which it is intended if the design thereof makes it unreasonably dangerous to a user who is using it for the purpose for which it is intended.
"***

"***A product or device is considered as unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by an ordinary user with the knowledge common to persons using such product, or such device as to its characteristics."

In view of our foregoing formulation of the standard for strict liability in tort for defective design, we find that the trial court's instructions to the jury were a sufficiently accurate statement of the law so that no prejudicial error was committed.

with its numerous illustrative comments***," *Temple* v. *Wean United, supra,* at page 322, an instruction on the duty to warn, in the context of a charge on strict liability, is not reversible error. Civ. R. 61. The absence of a warning does not, without more, provide a basis for liability; rather, evidence of warning is in the nature of an affirmative defense to a claim that a product is unreasonably dangerous. The instruction in the case *sub judice,* however, consistently linked the duty to warn with the duty to keep the product reasonably safe for intended use. Given the repeated emphasis in the jury instructions that the product must be found unreasonably dangerous for its intended use, the jury was not misled as to the proper burden of proof upon appellees.

### III.

Appellants in their proposition of law No. 4 contend that it was error for the trial court to have admitted in evidence television commercials which advertised the Jeep CJ-7 as a vehicle to "***discover the rough, exciting world of mountains, forests, rugged terrain." Appellants further contend that "a jury may not base its verdict upon such television commercials in the absence of a specific representation contained in the commercials as to the quality or merit of the product in question and in the absence from the plaintiff that the use of the product was in reliance upon such representations."

We held in Part I, *supra,* that a product is unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably foreseeable manner. The commercial advertising of a product will be the guiding force upon the expectations of consumers with regard to the safety of a product, and is highly relevant to a formulation of what those expectations might be. The particular manner in which a product is advertised as being used is also relevant to a determination of the intended and reasonably foreseeable uses of the product. Therefore, it was not error to admit the commercial advertising in evidence to establish consumer expectation of safety and intended use.

### IV.

Appellants' sixth proposition of law challenges the award of punitive damages to appellees. The trial court gave the

following instructions to the jury on the issue of punitive damages:

"* * *Punitive damage may be awarded only where a party intentionally and with actual malice injured another. Actual malice means anger, hatred, ill-will, hostility against another or a spirit of revenge.

"* * *

"Before you may award punitive damages in this case, the plaintiff must prove by a preponderance of the evidence that these defendants knew that the design of this rollbar and its support posed a grave danger to its customers and that the defendant's failure to redesign the rollbar and its support structure was intentional, reckless, wanton, willful or gross conduct."

In response to an interrogatory submitted by appellants, the jury explained its verdict as to punitive damages:

"Have you awarded punitive damages to either plaintiff in this action? *Yes*

"If the answer to the preceding question is 'yes' then state those facts from which you have found that the defendant acted:

"(a) Intentionally _____

"(b) Recklessly _____

"(c) Wantonly _____

"(d) Wilfully suggestive advertising depicting Jeeps going up and down steep and rugged terrain without any risk or warning.

"(e) Grossly neglected to test roll bar support system for foreseeable roll-overs and/or foreseeable pitch-overs."

The Court of Appeals affirmed the award of punitive damages totalling $1.1 million on the basis of "* * *the manufacturer's subjective awareness of the failure to make any plan for the forward pitch-over coupled with the incitement to reckless conduct contained in the advertisements involving clearly foreseeable risks of forward pitch-overs, plus a total failure to exercise any care at all to warn the public about the fact that the roll bar was not as safe as it looked, or as dangerous as the defendant knew it to be, for the advertised use, is, upon the record of this particular case, sufficient to warrant an inference of malice. The flavor of the sales promo-

tion program as an intentional incitement to unlawful conduct permeates the evidence."

The Court of Appeals relied upon appellants' advertising campaign as conduct from which actual malice could be inferred. Cited as exemplary of this "intentional incitement to unlawful conduct" was the sound track employed in the Jeep television commercials: "My Jeep CJ is the toughest rig around"; "That's Jeep guts—Guts to take you where only the toughest dares to go"; "Jeep guts—will take you places you have never been before"; "CJ-5—will give the young couples the ride of their lives on the dunes and gutsy ground steering"; "All right, which one of you guys is going to climb that big old hill with me? I mean you guys aren't yellow, are you? Is it a steep hill? Yeah, little lady, you could say it's a steep hill. Let's try it. The King of the Hill, is about to discover the new Jeep CJ-7"; "That Jeep four-wheel drive is tough enough to go anywhere."

It is an established principle of law in this state that punitive damages may be awarded in tort cases involving fraud, malice or insult. *Roberts* v. *Mason* (1859), 10 Ohio St. 277, paragraph one of the syllabus; *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, paragraph two of the syllabus. Actual malice may be inferred from conduct and surrounding circumstances. *Davis* v. *Tunison* (1959), 168 Ohio St. 471, paragraph two of the syllabus. Moreover, intentional, reckless, wanton, willful and gross acts which cause injury to person or property may be sufficient to evidence that degree of malice required to support an award of punitive damages in tort actions. *Columbus Finance* v. *Howard* (1975), 42 Ohio St. 2d 178, 184. There must be sufficient evidence of malice, however, before a question of punitive damages will be submitted to the jury. *Smithhisler* v. *Dutter* (1952), 157 Ohio St. 454, paragraph one of the syllabus.

In the case *sub judice,* sufficient evidence of malice is not apparent from the commercial advertising alone. The television commercials relied upon by the Court of Appeals demonstrated an off-the-road use. The commercials are relevant to the foreseeable use of the vehicle and the unreasonable danger of the product when used as intended. But, to characterize the commercials as "intentional incitement to unlawful activity" is

to read into them a malicious intent that is not apparent to this court. Mere "suggestive advertising" does not reach the level of "anger, hatred, ill-will, hostility***or a spirit of revenge" historically required for a finding of punitive damages under our cases.

The television and commercial advertising considered in conjunction with the evidence pertaining to the testing of the vehicle for roll-overs and pitch-overs is sufficient, however, to support a finding of punitive damages. Although simple negligence is not the basis for recovery of punitive damages in Ohio, *Richards* v. *Office Products Co.* (1977), 55 Ohio App. 2d 143, such damages may be awarded where the manufacturer's testing and examination procedures are so inadequate as to manifest a flagrant indifference to the possibility that the product might expose consumers to unreasonable risks of harm. See Owen, Punitive Damages in Products Liability Litigation, 74 Mich. L. Rev. 1258, at page 1340; Annotation, 29 A.L.R. 3d 1021.

The manufacturer alone has the ability to screen out many product hazards that are hidden from the consumer. While a manufacturer has no duty to provide a crashproof vehicle, *Larsen* v. *General Motors Corp., supra* (391 F. 2d 495), the record reveals that these appellants took no steps to ascertain the safety of the roll bar device on the 1976 Jeep CJ-7 vehicles. According to interrogatories answered by appellants, no "proving ground" tests, "vibration or shock" tests, or "crash" tests were performed on a 1976 Jeep vehicle equipped with roll bar assemblies. The record reveals that the only such testing ever done was on a 1969 CJ-5, a model with a wheel base ten inches shorter than the CJ-7, the subject vehicle. This testing was not, however, admitted in evidence.

The commercial advertising clearly contemplates off-the-road use of the vehicle. The salesman's guide to the vehicle described the roll bar in the following terms: "Surround yourself and your passengers with the strength of a rugged, reinforced steel roll bar for added protection. A very practical item, and a must if you run competition with a 4WD club. Adds rugged good looks, too." Given the foreseeability of roll-overs and pitch-overs, the failure of appellants to test to determine whether the roll bar "added protection" represents a flagrant

indifference to the probability that a user might be exposed to an unreasonable risk of harm. For appellants to have encouraged off-the-road use while providing a roll bar that did little more than add "rugged good looks" is a sufficient basis for an award of punitive damages.

## V.

Appellants raise a series of issues concerning the admission of evidence by the trial court.

In their proposition of law No. 13, appellants assert that evidence of an experiment performed on behalf of appellees by Michael Kaplan, an expert witness, should not have been admitted. In particular, the experiment consisted of piling weight on top of the roll bar of a Jeep CJ-7 to determine how much weight would cause its undergirding sheet metal to displace. The basis of appellants' argument is that the experiment represented a static event whereas the mishap was a dynamic event, and that this dissimilarity would tend to confuse and mislead the jury.

Kaplan was qualified by the trial court to testify as an expert witness. The admission of Kaplan's testimony concerning the similarity of conditions between the static experiment and the actual mishap was properly within the discretion of the trial court. *Wood* v. *General Electric Co.* (1953), 159 Ohio St. 273, 281. We find no abuse of that discretion in the admission of Kaplan's static experiment in evidence. Though the experiment was performed under somewhat dissimilar conditions than the mishap, the experiment was offered to demonstrate the weakness of the sheet metal under stress. It was not offered to recreate the accident. As such, the evidence of experiment was not so inherently misleading to the jury that its admission was an abuse of the discretion of the trial court. Moreover, with the help of cross-examination, the jury could recognize the dissimilarity between the experiment and the mishap. The dissimilarity, then, goes to the weight, not the admissibility of the evidence.

Appellants' proposition of law No. 12 alleges that appellees' expert witness, Dr. Samuelson, was improperly permitted to testify concerning the enhancement of appellees' injuries. The substance of appellants' assertion is that Dr. Samuelson lacked

specialized training in the dynamic movements of the human body within an automobile in an accident situation.

"It is a general rule that the expert witness is not required to be the best witness on the subject. [Citation omitted.] The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth." *Alexander* v. *Mt. Carmel Medical Center* (1978), 56 Ohio St. 2d 155, 159. Appellees qualified Dr. Samuelson, a neurosurgeon, as having performed at least 1,200 surgical operations on the human spine and spinal cord, and as having attended seminars where the dynamic movements of the human body within a crash situation were discussed at length. Since "the competency of an expert witness is a matter within the sound discretion of the trial court, and a court's ruling thereon will not be reversed unless there is a clear showing of an abuse of this discretion," *id.*, at page 157, and since appellees established Dr. Samuelson's familiarity with the issue of spinal injuries resulting from dynamic accidents, we find no abuse of discretion by the trial court in the admission of his testimony.

In their proposition of law No. 11, appellants contend that appellees' expert witness Alvin Weinstein was improperly permitted to testify in response to a hypothetical question which included a statement of Kaplan's earlier testimony regarding the pressure under which the roll bar, wheel housings and side panels would collapse. Additionally, appellants assert, Dr. Samuelson, appellees' medical expert, was permitted to respond to a hypothetical question which included the opinion testimony supplied by Kaplan as to the dynamic body movements of the appellees during the accident.

Appellants correctly state the applicable rule to be: "It is well settled that the opinion of an expert witness cannot be predicated either in whole or in part upon the opinions, inferences and conclusions of others, whether expert or lay witnesses." *Zelenka* v. *Indus. Comm.* (1956), 165 Ohio St. 587, at page 594. Thus, the admission of appellees' expert testimony based upon previous expert testimony was error. This error involved, however, answers to three questions in the context of more than 2,000 pages of testimony. Given the voluminous testimony concerning every potential aspect of this case, error in the admission of three answers cannot be

viewed as affecting the substantial rights of the parties, and is harmless error pursuant to Civ. R. 61.

Appellants assert in their proposition of law No. 7, that appellees' economist, John F. Burke, Jr., was improperly permitted to testify regarding the future income loss of a hypothetical individual without establishing that Jeanne Leichtamer fit into the hypothetical class. No objection was made to the testimony of Burke at the trial and, therefore, this issue is not properly before this court. See *State, ex rel. King,* v. *Shannon* (1960), 170 Ohio St. 393, 394.

In their proposition of law No. 10, appellants contend that appellees were improperly permitted to elicit an admission from appellants' witness, Robert Blaine, that he knew of a prior Jeep accident which occurred on October 3, 1975, without establishing precisely when Blaine learned of the accident. While such evidence does not establish that appellants had prior notice of an unreasonably dangerous condition of the Jeep CJ-7, its admission was harmless error pursuant to Civ. R. 61.

Appellants raise two additional issues. First, appellants contend, *inter alia,* in their proposition of law No. 9, that the trial court's charge to the jury "unduly emphasizes one view of the case by undue repetition of that side's contentions." We find no merit in this contention. The record reveals that the trial court restated the factual issues being submitted to the jury several times in the course of its charge. Given the complexity and length of the trial involved, the repetition only served to clarify the issues to the jury. Our view of the charge to the jury reveals no bias toward appellees.

Second, appellants' proposition of law No. 8 alleges that the Court of Appeals improperly conducted a trial *de novo* and made its own findings of fact as a basis for its holding.

We have reviewed the record presented in this cause and we find sufficient evidence to support the verdict of the trial court.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

CELEBREZZE, C. J., SWEENEY and C. BROWN, JJ., concur.

LOCHER, J., concurs in paragraphs one and two of the syllabus and in the judgment in relation thereto, but dissents from paragraph three of the syllabus and from the judgment relating thereto.

P. BROWN and HOLMES, JJ., dissent.

CLIFFORD F. BROWN, J., concurring.   Even if the Court of Appeals had adopted the negligence standard for a manufacturer's liability set forth in the *Larsen* v. *General Motors Corp.* case, *infra* (391 F. 2d 495), which the dissent urges as the applicable standard, the jury's answer to the in-, terrogatory (negligence in failing to test the roll bar support system), its general verdict for plaintiffs, and particularly its award of punitive damages, is more than enough to establish that defendants were negligent as well as liable under the strict liability standard of Section 402A of the Restatement of Torts 2d accepted by this court as the law of Ohio in the landmark case of *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317. The extensive discussion of the *Larsen* negligent design theory and reasonable care by the dissent is an effort to overrule our holding in *Temple* and should be regarded as an unsuccessful and abortive effort to retreat from *Temple.* We should not retreat from the progressive judicial thrust of *Temple.*

On the issue of punitive damages the record fully supports the jury response to an interrogatory submitted by defendants which stated that defendants acted intentionally, recklessly, wantonly, willfully and grossly. Defendants acted with reckless indifference to the safety of the plaintiffs and others by failing to test the roll bar system for foreseeable pitch-over. Such response supports the total award of punitive damages which was in an amount exhibiting restraint by the jury in the light of its specific factual findings.

The decision and majority opinion of this court today in this case demonstrates a commendable progressive judicial thrust forward in the field of tort law, joining the perspicacious thought in opinions in such recent cases as *Hawkins* v. *Ivy* (1977), 50 Ohio St. 2d 114, and in 1981, *Strother* v. *Hutchinson* (1981), 67 Ohio St. 2d 282; *Steadley* v. *Montanya* (1981), 67 Ohio St. 2d 297; *Schenkolewski* v. *Cleveland*

*Metroparks System* (1981), 67 Ohio St. 2d 31; *Cash* v. *Cincinnati* (1981), 66 Ohio St. 2d 319; *Stone* v. *Davis* (1981), 66 Ohio St. 2d 74; *Starcher* v. *Logsdon* (1981), 66 Ohio St. 2d 57; *Scot Lad Foods* v. *Secy. of State* (1981), 66 Ohio St. 2d 1; *Loveman* v. *Hamilton* (1981), 66 Ohio St. 2d 183; and in *Whitt* v. *Columbus Cooperative* (1980), 64 Ohio St. 2d 355, which is a refreshing contrast with some 1981 tort cases of this court showing a thrust in the opposite direction, *e.g.*, *Lewis* v. *Certified Oil* (1981), 67 Ohio St. 2d 277; *Jenkins* v. *Krieger* (1981), 67 Ohio St. 2d 314; *Reed* v. *Molnar* (1981), 67 Ohio St. 2d 76; and *Kuenzer* v. *Teamsters Union Local 507* (1981), 66 Ohio St. 2d 201.

HOLMES, J., dissenting. Since I fundamentally disagree with not only the analysis of the majority of this court, but also the analysis of the Court of Appeals, I am compelled to dissent. I dissent as to the award of both compensatory and punitive damages.

Taking first the basis of the Court of Appeals' decision as to compensatory damages, that court's reasoning is not substantiated by the evidence in this case. The Court of Appeals based its review upon answers to interrogatories made by the jury in response to a question explaining its award of punitive damages. The jury said:

"Wilfully suggestive advertising depicting Jeeps going up and down steep and rugged terrain without any risk or warning,

"Grossly neglected to test roll bar support system for foreseeable roll-overs and/or foreseeable pitch-overs."

Upon these statements, the Court of Appeals based its judgment affirming not only the award of punitive damages, but also the award of compensatory damages.

That court's theory was that the appellants' advertising, including the name of the vehicle, "Renegade," would induce a consumer to use the vehicle in the manner in which it was used in the present case. Such use, according to the Court of Appeals' determination, will tend to increase the risk of pitch-overs. Concomitantly, there is an implied representation that this can be done safely because of the roll bar's added safety.[3]

---

[3] At this point it is important to emphasize that the appellees' theory is not that some defective condition of the vehicle caused the pitch-over. The appellees concede

Even assuming all of this is true, the shortcoming of this reasoning is that there is not sufficient evidence in the record to support a finding that either the appellees, who were passengers, or the driver relied upon such a representation. In order to recover under such a theory, it was necessary for the appellees to have proved that their injuries were caused by justifiable reliance upon the added protection of the roll bar. See Section 402B of Restatement of Torts 2d. This they did not do.

The majority herein, however, supports its affirmance of compensatory damages for different reasons than the Court of Appeals. The majority reaches its decision by virtue of the application in a second collision case of the doctrine of strict liability as contained in Section 402A of the Restatement of Torts 2d.

I am unable to join in this analysis. In a products liability action based upon an alleged design defect of the product, which allegedly has enhanced the plaintiff's injuries, I feel that the manufacturer should be held liable only when the plaintiff is able to prove that the manufacturer was negligent in adopting his chosen design. See, *e.g., Volkswagen of America* v. *Young* (1974), 272 Md. 201, 321 A. 2d 737; *Frericks* v. *General Motors Corp.* (1975), 274 Md. 288, 336 A. 2d 118.

It is my view that the proper rule to be applied in crashworthiness cases is set forth in *Larsen* v. *General Motors Corp.* (C.A. 8, 1968), 391 F. 2d 495, 503, as follows:

"***The manufacturers are not insurers but should be held to a standard of reasonable care in design to provide a reasonably safe vehicle in which to travel***.

"This duty of reasonable care in design rests on common law negligence that a manufacturer of an article should use reasonable care in the design and manufacture of his product to eliminate any unreasonable risk of foreseeable injury."

See, also, *Shumard* v. *General Motors Corp.* (D.C. S.D. Ohio, E.D. 1967), 270 F. Supp. 311.

There should be no requirements in the law that manufacturers must design their automotive products to withstand ex-

---

that the pitch-over was caused by the driver's negligence. However, the appellees assert that their injuries were enhanced by the failure of the roll bar to support the vehicle once the pitch-over occurred.

traordinary accidents of unusual circumstance or severity. Accordingly, *Larsen* v. *General Motors, supra,* states, at page 502, that, "an automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle\*\*\*." Clearly, the manufacturer cannot reasonably be required to design a car to withstand all collisions under any and all circumstances. *Jeng* v. *Witters* (D.C. M.D. Pa. 1978), 452 F. Supp. 1349.

The application of the standard of reasonable care imposes upon the manufacturer the duty to design a product not necessarily to make it accident-proof, but to make it safe for its intended use. This is the standard as set forth in Sections 395 and 398 Restatement of Torts 2d as to the test of negligent design in product liability cases.

My belief that these enhanced injury cases should be determined upon negligence principles rather than upon strict liability, or implied warranty principles, is based upon a number of reasons. I do not feel that the standards for imposition of liability under Section 402A provide sufficient guidance to the jury. Rather, I agree with the position taken by one commentator:

"\*\*\*What is needed is a system which works well for design cases by permitting jurors to consider *all* relevant factors in ascertaining whether a particular design is one for which liability should be imposed. Such a system, which is in practice today, and which would require little adaptation, is the theory of negligence." Hoenig, Product Designs and Strict Tort Liability: Is There a Better Approach? 8 Sw. U. L. Rev. 109, 122 (footnote omitted).[4]

Additionally, courts have seemingly had a difficult time defining what Section 402A means. Section 402A, and the majority, would impose liability when a product is in "a defective condition unreasonably dangerous." The problem is the lack of

---

[4] The author argues that the imposition of liability solely on the basis of negligence would not differ greatly from the "strict liability" tests advocated by some authors. See, *e.g.,* Wade, On the Nature of Strict Tort Liability for Products, 44 Miss. L. J. 825; Keeton, Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products, 20 Syracuse L. Rev. 559.

See, also, Henderson, Renewed Judicial Controversy over Defective Product Design: Toward the Preservation of an Emerging Consensus, 63 Minn. L. Rev. 773 (author argues that liability should be imposed only under a cost-benefit analysis).

uniformity and understanding of those terms.[5] See, *e.g.*, *Caterpillar Tractor Co.* v. *Beck* (Alaska 1979), 593 P. 2d 871 (where the court lists four tests, in addition to the Restatement "test," that courts have developed to determine product effectiveness). On the other hand, courts, lawyers and jurors are familiar with concepts of negligence. These concepts are also uniformly applied.

Here, the only substantive instruction of law given by the trial court to the jury in the instant case defined the manufacturer's duty in terms of strict liability as follows:

"The doctrine of 'breach of implied warranty' as charged in the Complaint does not depend on proof of fault.***

"To recover for a breach of implied warranty, to provide a product free of defect in design and reasonably safe for the use for which it was intended, a plaintiff need not prove that any part of the product broke, fell apart, wore out or malfunctioned. The issue is not the degree of care exercised in the design and manufacture of the product, but rather the degree of safety of the ultimate product itself.***"

The Court of Appeals held that such an instruction was harmless error in that the express fact findings of the jury showed the verdict was based upon willful misconduct and gross negligence, and not strict liability or breach of implied warranty. I am unable to accept this conclusion in that the findings were not supported by the evidence, and as stated, the findings were in response to the punitive damage issue.

Applying the appropriate standard to the facts in this case, the plaintiff, in addition to proof of specific knowledge of, and reliance upon, any claims of protective security offered by the roll bars in instances of Jeep pitch-overs, would have to prove that the accident was one reasonably foreseeable and not an extraordinary accident, or of unusual circumstance or severity. Also, the plaintiff would have to prove that there was a safer alternative design available, practicable under the circumstances.

As stated, there was a significant absence of specific proof

[5] Compare *Barker* v. *Lull Engineering Co., Inc.* (1978), 20 Cal. 3d 413, 143 Cal. Rptr. 225 (no need to prove that a product is unreasonably dangerous as well as in a defective condition), with *Phillips* v. *Kimwood Machine Co.* (1974), 269 Ore. 485, 525 P. 2d 1033 (adopting a risk-benefit analysis test to determine whether a product is unreasonably dangerous).

as to any reliance by these plaintiffs upon the capability of the roll bar in a pitch-over situation or otherwise. Additionally, there was an insufficiency of proof that this type of an accident, involving a pitch-over of a Jeep, was a common accident and one reasonably foreseeable. In fact, the evidence would tend to controvert such a finding in that there was testimony from both plaintiffs' and defense witnesses that pitch-overs are rare events which occur infrequently and only if the specific conditions necessary to bring it about exist.

American Motors presented testimony that the roll bars were installed on these Jeeps to aid in the protection of occupants in roll-over situations, not pitch-over accidents as was occasioned here. In support of this concept, the company attempted at trial to introduce "Exhibit F" which was a movie showing roll bar tests with a Jeep CJ-5. The film was offered to show that there had been such tests on the roll bar prior to putting the roll bars into production. The trial court refused admission of such film as evidence.

There also was a failure of proof here as to any alternate safer design practicable under the circumstances of a pitch-over rather than a roll-over, and absence of any proof of any lessened or differential injuries that might have been sustained had an alternate design been installed in this jeep.

As stated, in the application of the proper standards here, the manufacturer's duty is to exercise reasonable care in the design of its product to eliminate any reasonable risk of foreseeable injury, but it need not be designed to make the vehicle accident-proof. The liability of this defendant under the facts should have been submitted to the jury, not on the strict liability theory, but upon the theory of negligence with applicable standards of ordinary care and foreseeability.

Lastly, as to the award of punitive damages, this court held in *Smithhisler* v. *Dutter* (1952), 157 Ohio St. 454, at paragraph one of the syllabus:

"In tort actions, the questions of punitive damages may not ordinarily be submitted to a jury in the absence of actual malice."

In *Miles* v. *Perpetual S. & L. Co.* (1979), 58 Ohio St. 2d 93, this court held at pages 96-97, that where there is no evidence establishing that the defendant's actions are motivated by ac-

tual malice and where there is no evidence from which reasonable minds can find that the defendant acted in a malicious, wanton, or reckless manner, it is error to submit such case to a jury for determination.

In the instant case, the jury found that the defendants had acted willfully on the basis of the company's advertising, and that the defendants had acted grossly because they had "neglected to test [the] roll bar support system for foreseeable roll-overs and/or foreseeable pitch-overs." The evidence in the record does not support the conclusions reached by the jury. The advertising does not suggest that there is no risk, nor does the advertising proclaim the roll bar to be the all protective or injury prohibiting device. Also, as indicated, the defendants established that pitch-overs are rare, and that a roll bar had been devised and tested for side-rolls, the accident known more frequently to occur.

There was no evidence presented sufficient for the establishment of punitive damages. In any event, the jury's stated conclusions are legally insufficient to justify the award of punitive damages.

Accordingly, I would reverse the judgment of the Court of Appeals.

P. BROWN, J., concurs in the foregoing dissenting opinion.

LOCHER, J., concurs in that part of the foregoing dissenting opinion having to do with punitive damages.