[Cite as *In re S.G.*, 2022-Ohio-4292.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

IN RE:

S.G., DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 BE 0030**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division of Belmont County, Ohio
Case No. 21 JC 28

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Rhonda G. Santha,* 6401 State Route 534, West Farmington*,* Ohio 44491 for Appellant and

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, *Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, 52160 National Road, St. Clairsville, Ohio 43950 for Appellee

Dated: November 17, 2022

---

**Robb, J.**

{¶1} Appellant, Janelle Crow, appeals the May 25, 2022 judgment issued by the Belmont County Court of Common Pleas, Juvenile Division, terminating her parental rights regarding her minor child, S.G., and granting permanent custody to Appellee, the Belmont County Department of Job and Family Services, Children Services Division (the Agency). Appellant argues the Agency failed to use reasonable efforts to reunify her with her child and she was denied due process via the Agency's failure to establish the qualifications of the caseworker overseeing Appellant's case. For the following reasons, we affirm.

## Statement of the Case

{¶2} The Agency secured temporary custody of S.G. in January of 2021. She was six years old at the time. The complaint and custody affidavit state in part that Appellant had legal custody of S.G., but the child primarily stayed with her father, a registered sex offender. S.G. had informed the caseworker about sexual abuse involving her father while she stayed with him. According to the affidavit, the child also advised the caseworker she was afraid to stay with Appellant because Appellant's boyfriend was an abusive alcoholic, and he would lock her in a dark room.

{¶3} Appellant and S.G.'s father were present at the emergency shelter hearing held January 25, 2021. The court appointed separate counsel for both parents and found the continued placement of S.G. with the Agency was required. It also ordered a case plan to be filed within 30 days and appointed a guardian ad litem (GAL). (January 26, 2021 Journal Entry.)

{¶4} The first GAL report reiterated the history of the child's removal from her parents and detailed the GAL's interviews with Appellant and S.G.'s father. Appellant denied her boyfriend was mean or abusive toward S.G., but Appellant expressed concerns about S.G.'s father. He, on the other hand, denied any inappropriate conduct with S.G. and explained away his status as a sex offender as part of a plea bargain. (February 25, 2021 GAL report.)

{¶5} The court subsequently approved the family case plan, which identified as its permanency goal to return S.G. to her parents. Regarding Appellant, the plan stated she needed to establish a safe and stable residence with working utilities. It also stated

a primary concern was Appellant did not have the resources to secure a safe living environment for the child. The case plan also indicated Appellant needed individual therapy and a psychological assessment. Appellant was permitted to visit S.G. in an Agency setting. (March 5, 2021 Family Case Plan.)

{¶6} The GAL's second report recommended S.G. remain in the Agency's care. It also recommended both parents undergo random drug screening on hearing dates. (April 9, 2021 GAL Report.)

{¶7} The trial court found S.G. to be dependent and granted temporary custody to the Agency at the April 16, 2021 adjudicatory hearing. S.G.'s father was silent as to the allegations in the complaint, and Appellant did not appear for the hearing. The court noted the Agency's reasonable efforts included case plan services, forensic services, and foster home placement. (April 16, 2021 Journal Entry.)

{¶8} The case plan was updated. It stated services were added; psychological evaluations for all three family members were needed; and each family member was required to follow the recommendations from their respective evaluations. (April 30, 2021 Family Case Plan.)

{¶9} The third GAL Report states in part: "Both parents were scheduled to begin parenting classes on June 9th, 2021, and both failed to begin. Mother * * * has not visited * * * since before Easter. * * * [S]he has not requested any visits. Father * * * has had no visits * * *. She has had telephone contact with neither parent." (July 1, 2021 GAL Report.) The report also emphasized S.G. was improving in school while in foster care and she may be switching school districts to repeat kindergarten. The GAL recommended she stay in the temporary custody of the state and continue counseling services. (July 1, 2021 GAL Report.)

{¶10} The July 6, 2021 semiannual administrative review indicates both of S.G.'s parents have diabetes, but neither were taking care of their medical needs and were not following their doctors' directives. It also stated there may be criminal charges against S.G.'s father for his inappropriate conduct involving S.G. Regarding Appellant, the review said she was still living with her abusive boyfriend and had no plans on leaving him. Neither parent went to the parenting classes, but they told the caseworker they would go to the next session, which started 12 weeks later. Appellant advised she had been unable

to visit the child since March because of her work schedule. The review also indicated S.G.'s counseling needs had been unfulfilled while in her mother's care, and S.G. needed major dental work, which had not been addressed. S.G. was unable to return to her mother's care because of domestic violence and drug concerns. (July 6, 2021 Semiannual Administrative Review.)

{¶11} The subsequent hearing and Journal Entry indicate: "the Court hereby determines that reasonable efforts have been made * * * to prevent or eliminate the need for removal of said child * * *." The court also concluded, "parents of the child have made insignificant progress on the case plan requirements * * *." (July 8, 2021 Journal Entry.)

{¶12} The October 1, 2021 Case Review detailed several improvements in the child's physical and mental developments in the Agency's care. It stated S.G. asked a caseworker to ask her parents to allow her to be adopted. S.G. is quoted as saying "they won't be sad for long, and I am happy and safe now." This review also noted the "[p]arents have not done any more on their case plan." Appellant "has not been an active part of this case since the beginning. * * * She was not the primary caretaker and has done nothing to try to show that she wants to be." Both parents "struggle with their own mental health, let alone take on managing [S.G.'s]." The review also stated neither parent addressed the drug/alcohol abuse concerns and both made excuses as to why they could not meet with the caseworker. It states, "there are no barriers to services," and S.G. was the "only one working. Parents have been told repeatedly about timeframes * * *." The review emphasized S.G. is "making great strides" in foster care, and her overall quality of life has greatly improved. (October 1, 2021 Case Review.)

{¶13} In December of 2021, the Agency moved for permanent custody of S.G., alleging Appellant abandoned S.G. per R.C. 2151.414(B)(1)(b). As for S.G.'s father, the Agency sought permanent custody on the basis that S.G. could not be placed with him within a reasonable time or should not be placed with him pursuant to R.C. 2151.414(B)(1)(a) and 2151.414(E).

{¶14} After a hearing, the trial court granted the state's motion as to Appellant and S.G.'s father and concluded R.C. 2151.414(B)(1)(a) was applicable to both parents. The court also found Appellant abandoned S.G. under R.C. subsection (E)(10) and the grant of permanent custody to the Agency is in the child's best interest under R.C. 2151.414(D).

Case No. 22 BE 0030

{¶15} At the January 5, 2022 annual review hearing, the court again noted reasonable efforts have been made and were continuing, including case management, counseling, case plan services, foster placement, and therapeutic foster placement. The court also found Appellant was present and had tested positive for cocaine and methamphetamine. (January 5, 2022 Journal Entry.)

{¶16} The permanent custody hearing was set for February 10, 2022 and then reset to March 31, 2022.

{¶17} The March 24, 2022 GAL Report mentioned Appellant had been hospitalized three times during the trial court proceedings. It also provided significant details about S.G.'s sexual abuse. The GAL's recommendations stated in part: "I cannot recommend she be given custody * * *. [Appellant] has been unable to pass a drug screen, was absent for several months while this matter was pending, has not provided access to a suitable home * * *, and appears to have trouble managing her own medical needs." (March 24, 2022 GAL Report.)

{¶18} The permanent custody hearing was held March 31, 2022 and April 18, 2022. Dr. David Kotarsky testified he performed both Appellant and S.G.'s father's psychological assessments. Regarding Appellant, he explained she was bipolar and for her recommended services, Kotarsky advised she consider medications to stabilize her moods, attend weekly or bi-weekly therapy, and take parenting classes. (March 31, 2022 Tr. 24-26.)

{¶19} The Agency representative, Shannon Weekley, testified at the hearing that she is the second caseworker to handle and oversee S.G.'s case. Weekley was at the initial family planning meeting from which the case plan was generated. She confirmed each family member was required to undergo a psychological assessment, and that Appellant and S.G.'s father were to complete parenting classes and attend and receive individual mental health treatment. Appellant also needed to undergo substance abuse treatment.

{¶20} Weekley explained she had numerous conversations with Appellant about what Dr. Kotarsky's recommendations were, and other than undergoing the assessments, she did not believe either parent undertook any steps to complete the stated requirements. Weekley said she spoke with both parents during face-to-face meetings

and reviewed in person what they should have been doing to achieve reunification with S.G. Weekley said she offered rides, gas vouchers, and other assistance to enable them to satisfy the recommendations.

**{¶21}** Weekley also explained there was no indication by either parent that there would be any follow through or that they intended to participate in or undergo the necessary services and case plan requirements. (March 31, 2022 Tr. 124-131.)

**{¶22}** After Appellant visited Dr. Kotarsky, Weekley did not write out and update Appellant's case plan to include the additional services. Weekley did, however, reiterate the additional services to Appellant for the duration of the case.

**{¶23}** Weekley testified about how Appellant had initially visited S.G. She did not, however, visit in April, May, or June. Appellant said she could not visit due to her work schedule, so the caseworkers offered her varying scheduling options. Appellant's last visit with her daughter was April 6, 2021. Meanwhile, Weekley explained how well S.G. was doing in foster care. She had improving grades and life skills.

**{¶24}** When Appellant's drug screen was positive for cocaine, Weekley spoke with her about securing drug treatment and explained she needs to be drug free for reunification. At times, Appellant did not return her calls or text messages about visitation. (Tr. 140-142.) On cross-examination, Weekley conceded she did have concerns that Appellant may have not understood what Weekley was explaining to her. Appellant verbally agreed to attend the parenting classes but never did. (Tr. 55.)

**{¶25}** Weekley also relayed her significant concerns about Appellant meeting S.G.'s physical and mental health needs because Appellant was a diabetic and failed to secure her own medical care. Appellant was in the intensive care unit three times during one month because she was not taking care of herself. (Tr. 156, 170.) Weekley asked Appellant to let her know when the parenting classes started, and she never did. (Tr. 158.) In July of 2021, Weekley made three scheduled in-person visits with Appellant and S.G.'s father, and they canceled each of them. (Tr. 159-160.) Weekley suspected the meetings were canceled because they wanted to avoid drug testing. A similar thing happened in September. (Tr. 161-162.)

**{¶26}** The Agency initiated this case in January of 2021, and as of September, neither parent had begun the parenting classes. (Tr. 163.) Weekley also offered to help

Appellant secure food and assistance.  And in an attempt to get Appellant away from her abusive boyfriend, Weekley offered to take her to a shelter, but she declined.

{¶27}  The permanent custody hearing continued on April 18, 2022, and at the beginning of the second hearing date, the court noted that neither parent/party was in attendance.  Counsel for Appellant asked for a continuance since Appellant was experiencing a medical emergency, but details were not provided as to the nature of her emergency.  The Agency did not oppose the continuance, but noted Appellant's frequent absence was a significant road block preventing her from obtaining the services needed for reunification.  The court proceeded without Appellant, but her attorney was present for the entirety of the hearing.

{¶28}  The Guardian Ad Litem testified she was involved with this case since the beginning.  She met with Appellant several times and was concerned Appellant was intoxicated, noting she had glassy eyes and slurred speech.  The GAL said Appellant seemed unhealthy and looked "incredibly ill."  (Tr. 211.)  During one phone call with Appellant, Appellant's mother had to wake her to take the call.  Thereafter, Appellant's speech was slurred, and it sounded like she fell back to sleep during the call.  The GAL summarized her concerns about Appellant:

> "With regard to mom, it was her inability to pass her [drug] screens consistently and just her inability to remain consistent with the agency or with me.  She would come in and out of contact.  She wouldn't remain consistent in her contact.  She wouldn't show up for visits to the point that visits ended up stopping."  (Tr. 215.)  And while the child was in Appellant's custody, she was leaving her with her father.  S.G. had significant learning delays and showed emotional and behavioral problems which needed consistent care and attention.  The GAL recommended permanent custody be awarded to the Agency.

(Tr. 219-220.)

{¶29}  The court issued its May 25, 2022 Judgment Entry granting the Agency permanent custody of S.G. and permanently terminating Appellant's and S.G.'s father's parental rights.  The court held in part:

[T]he Court does find that the Mother has demonstrated a lack of commitment toward S.G. by failing to regularly support, visit or communicate with the child when able to do so or by other actions showing an unwillingness to provide an adequate permanent home for S.G. * * * pursuant to Weekley's testimony, the last time Mother saw S.G. was on April 6, 2021. Further, Mother was never able to demonstrate to Weekley that she was able to provide an adequate permanent home for S.G.

Pursuant to subsection (E)(10), the Court finds that Mother has abandoned S.G. * * * Pursuant to O.R.C. 2151.011(C), abandonment results when a parent has not had any contact or communication with a child for a ninety (90) day period. Indeed, more than 90 days had expired from April 6, 2021, to July 7, 2021, when the Court conducted its Semi-Annual Review proceedings. Subsequent to those proceedings, the Mother did not have any visitation or attempt to coordinate the same with Weekley. Therefore, the ninety (90) day period was clearly established in this case. Moreover, * * * the excuse (transportation) offered by Mother's counsel concerning her failure to have any visitation was unpersuasive * * *.

* * *

Therefore, the Court does find that at least one * * * subsection under O.R.C. 2151.414(E) was established by clear and convincing evidence in this case.

(May 25, 2022 Judgment Entry.)

**{¶30}** Appellant appeals and raises two assignments of error. S.G.'s father is not a party on appeal.

**{¶31}** Before addressing Appellant's arguments, we note Appellee is urging dismissal of this appeal as untimely. As Appellee alleges, Appellant's notice of appeal was filed June 27, 2022, more than thirty days after the time to file an appeal from the court's May 25, 2022 judgment.

**{¶32}** Civ.R. 58(B) directs the clerk of courts to serve the parties with notice of the judgment within three days of entering the judgment upon the journal. If the Civ.R. 58(B) service does not occur within three days, the time to appeal does not begin to run until

Case No. 22 BE 0030

service is made and noted in the appearance docket. App.R. 4(A)(3); *Coles v. Lawyers Title Ins. Corp.*, 163 Ohio App.3d 659, 2005-Ohio-5360, 839 N.E.2d 982, ¶ 15-16.

**{¶33}** Here, the thirty-day period in App.R. 4(A)(1) did not begin to run on the date of the court's judgment because service was not noted on the docket within the requisite three days. *Id.*; *Tripoulas v. Frenchko*, 11th Dist. No. 2017-T-0056, 2017-Ohio-6950, 94 N.E.3d 900, ¶ 4-6. Thus, Appellant's appeal was timely, and Appellee's motion to dismiss is denied.

### First Assignment of Error:  Agency's Reasonable Efforts

**{¶34}** Appellant's first assigned error contends:

"Appellee failed in its reasonable efforts to reunite Appellant with her child, in contravention of the Ohio child welfare statutes."

**{¶35}** Appellant contends the Agency failed to assert reasonable efforts for reunification.  She cites the court's notation in its May 25, 2022 judgment that the caseworker "did not update the case plan to include the additional services being recommended as a result of the evaluations" in support.  Appellant further claims the court's lack of specificity in its references to "recommended services" fails to show reasonable efforts or specific services Appellant was required to attain to allow her to be reunified with S.G.  Last, Appellant claims the caseworker failed to follow up with the psychologist after Appellant's assessment and the caseworker's lack of knowledge about the number of drug screens offered to Appellant from July to December of 2021 show the Agency had "given up on the parents."  (March 31, 2022, Tr. 200.)  We disagree.

**{¶36}** It is well established that a parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).  The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14; *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (1991).  Based on these principles, the Ohio Supreme Court has determined a parent "must be afforded every procedural and substantive protection the law allows."  (Citation omitted.) *Hayes* at 49, 679 N.E.2d 680.

**{¶37}** When the state intervenes to protect a child's health or safety, "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to

return home after the threat is removed are called 'reasonable efforts.'" (Citation omitted.) *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 29. Various sections of the Ohio Revised Code set forth an agency's duty to make reasonable efforts; the concept is not encompassed in a single section. *Id.*

**{¶38}** However, the statutory requirement that a court determine whether an agency has made reasonable efforts to return a child to the parents' home does not apply in a permanent custody proceeding. *Id.* at ¶ 41-42, 862 N.E.2d 816. Instead, the "reasonable efforts" requirement applies at other, earlier stages of the proceeding. *Id.*

**{¶39}** "R.C. 2151.419 *does not apply* in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 and R.C. 2151.414. * * * [T]his does not mean that the agency is relieved of the duty to make reasonable efforts." (Emphasis added.) *In re J.F.F.,* 5th Dist. Stark No. 2009-CA-00133, 2009-Ohio-4736, at ¶ 24, citing *In re C.F.* at ¶ 42. Instead, "'the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification.'" *Id.* However, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F., supra.*

**{¶40}** Thus, it is only when the agency "has not already proven reasonable efforts [that] the agency must do so at the permanent custody hearing." *Id.* at ¶ 4, 43. Thereafter, the Supreme Court in *In re C.F.* emphasized the trial court had made findings as to reasonable efforts throughout that case. The reasonable efforts findings were made at the removal, adjudication, temporary custody, and review hearings. *Id.* at ¶ 45. Consequently, there was no need to re-establish the efforts at the permanent custody hearing. *Id.*

**{¶41}** On several occasions, the trial court here found the Agency made reasonable efforts to safely return S.G. to her mother. The court noted the Agency's reasonable efforts, including case plan services, foster home placement, case management, counseling, and therapeutic foster placement on several occasions, including in its April 16, 2021 Journal Entry, July 8, 2021 Journal Entry, and at the January 5, 2022 annual review hearing.

Case No. 22 BE 0030

**{¶42}** Accordingly, the trial court made findings on reasonable efforts throughout the proceedings prior to the filing of the permanent custody motion, and the filing of a permanent custody motion is a dispositive point for reasonable efforts. *Matter of A.L.F.*, 7th Dist. Columbiana No. 18 CO 0024, 2019-Ohio-937, ¶ 54; *see* R.C. 2151.413(D)(3)(b) (agency cannot file motion if reasonable efforts are required but the agency has not provided the services required by the case plan). Thus, as in *In re C.F.,* the Agency did not have to prove the reasonable efforts it made again at the permanent custody hearing.

**{¶43}** Nonetheless, we agree the evidence demonstrates the Agency exerted reasonable efforts toward reunifying Appellant with S.G. The Agency offered Appellant resources in an attempt to help her complete her case plan goals. It directed Appellant to Dr. Kotarsky to secure her psychological assessment, who recommended mental health treatment consisting of medication and therapy. The caseworker also testified about her repeated contacts with Appellant in an attempt to help her secure the recommended parenting classes, mental health care, and substance abuse services, which Appellant needed before reunification could occur. She offered her rides and gas vouchers. Appellant was also offered food assistance and assistance getting into a shelter to get her away from her abusive boyfriend. Unfortunately, Appellant was either unable or unwilling to take the necessary steps despite the caseworker's ongoing efforts, calls, and in person meetings.

**{¶44}** Our review is consistent with the trial court's decision finding the Agency employed reasonable efforts to reunite Appellant with her child. The trial court noted that although the caseworker should have updated the case plan, this did not diminish the Agency's continuing and repeated efforts to communicate with both parents to secure the requisite services to facilitate reunification. "[T]he Agency should not be blamed for the Mother and Father's lack of effort to arrange for those services." (May 25, 2022 Judgment Entry.)

**{¶45}** Based on the foregoing, Appellant's first assignment of error lacks merit.

**Second Assignment of Error:  Qualifications of Caseworker**

**{¶46}** Appellant's second assigned error contends:

"Appellant was denied due process of law by Appellee's lack of submission of Agency personnel qualifications in contravention of Ohio Administrative Code 5101:2-33-55 *Education and training requirements for PCSA caseworkers*."

**{¶47}** Appellant contends the termination of her parental rights constitutes a due process violation because the Agency failed to establish the qualifications of the caseworker employed by the Belmont County Department of Job and Family Services, Children Services Division and who managed Appellant's family's case. For the following reasons, this assignment of error lacks merit.

> "It is well-recognized that a parent must be afforded every procedural and substantive protection that the law allows before parental rights may be terminated. *In re J.Z.,* [10th Dist. Franklin No. 05AP-8, 2005-Ohio-3285,], at ¶ 9; *In re Hayes,* [79 Ohio St.3d 46, 679 N.E.2d 680 (1997), *reconsideration denied*, 79 Ohio St.3d 1492, 683 N.E.2d 793], at 48, quoting *In re Smith,* [77 Ohio App.3d 1, 16, 601 N.E.2d 45, (1991)] at 16. Moreover, '[d]ue process includes a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing.' *In re J.Z.,* at ¶ 9, citing *In re Thompson* (Apr. 26, 2001), Franklin App. No. 00AP–1358, 2001 Ohio App. LEXIS 1890, 2001 WL 424044."

*In re M.W.,* 10th Dist. Franklin No. 07AP-529, 2007-Ohio-6506, ¶ 79.

**{¶48}** The premise of Appellant's argument is the Agency had a legal obligation to establish the qualifications of its caseworkers who worked on Appellant's case. She claims that the Agency's failure to satisfy this alleged requirement constitutes a due process violation and warrants reversal of the trial court's judgment. However, the Section of the Administrative Code on which Appellant relies does *not* require public children services agencies to prove its employee's qualifications before it can participate in an action regarding the termination of parental rights.

**{¶49}** Ohio Admin. Code 5101:2-33-55, effective until June 14, 2022, states in part:

> B) A public children services agency (PCSA) may hire a caseworker only if the applicant has one or more of the following:

Case No. 22 BE 0030

(1) Bachelor's degree in human services related studies.

(2) Bachelor's degree in any field and employed for at least two years in a human services related occupation.

(3) Associate's degree in human services related studies.

(4) Employed for at least five years in a human services related occupation.

(C) At the time of employment, the PCSA shall inform the employee of the educational requirements in order to continue employment with the agency.

(D) For employment to continue, a person described in paragraph (B)(2), (B)(3), or (B)(4) of this rule must obtain a job-related bachelor's degree not later than five years after the date employment with the agency commences.

(E) A caseworker employed by the PCSA prior to October 5, 2000 is not required to comply with the educational provisions contained in paragraphs (B), (C) and (D) of this rule.

**{¶50}** A plain reading of this provision does not impose a burden on a public children services agency to establish its caseworker's qualifications during a parental right termination proceeding. *Id.*

**{¶51}** The foregoing section also provides certain caseworkers five years to satisfy the stated requirements and exempts other caseworkers from the requirements altogether. *Id.* Appellant does not address these exceptions or whether they apply here.

**{¶52}** Appellant likewise does not direct our attention to any rule or case supporting her argument that noncompliance with the foregoing has any effect on the acts of the Agency or its allegedly noncompliant caseworker.

**{¶53}** Further, even assuming the Agency had an obligation to prove its caseworkers satisfied the foregoing educational requirements, Appellant did not file a motion raising this issue and did not challenge the qualifications of the Agency's caseworkers or object to their testimony on this basis. There were no questions directed toward the caseworker about her education during the hearing and no testimony on this issue.

**{¶54}** A party has an obligation to preserve a matter for appellate review, and the failure to do so generally forfeits the issue on appeal. *J & H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.*, 10th Dist. No. 13AP-732, 2014-Ohio-1963, ¶ 19 ("Issues that could have been raised and resolved in the trial court cannot be raised for the first time on appeal."); *Leichtamer v. Am. Motors Corp.*, 67 Ohio St.2d 456, 475, 424 N.E.2d 568 (1981) (declining to address admissibility of testimony when no objection raised to trial court).

**{¶55}** Accordingly, Appellant's second assignment of error lacks merit and is overruled.

## Conclusion

**{¶56}** Contrary to Appellee's argument, Appellant's notice of appeal was timely, and this court has jurisdiction to consider this appeal. Thus, Appellee's argument, which we construe as a motion to dismiss, is overruled.

**{¶57}** As for Appellant's first assignment of error, she fails to show the Agency did not employ reasonable efforts to reunite Appellant with her child or the trial court failed to make this finding during the proceedings. Appellant's second assignment of error does not establish error or a denial of due process. Accordingly, Appellant's assignments of error lack merit, and the trial court's decision is affirmed.

Donofrio, P. J., concurs.

D'Apolito, J., concurs.

[Cite as *In re S.G.*, 2022-Ohio-4292.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error and motion to dismiss are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division of Belmont County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial cour t to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**