Deborah J. BIRCHFIELD, Administratrix, Estate of William K. Birchfield, Deceased, Plaintiff-Appellant,

v.

INTERNATIONAL HARVESTER COMPANY, Defendant-Appellee.

No. 81–3105.

United States Court of Appeals, Sixth Circuit.

Argued June 23, 1982.

Decided Feb. 1, 1984.

---

1. One witness described the suspect as having hair "a little longer than shoulder length." (Jt. App. at 71).

**1132**

Bernard K. Bauer, argued, O'Brien & Bauer, Findlay, Ohio, for plaintiff-appellant.

Louis Paisley, argued, John S. Kluznik, Cleveland, Ohio, for defendant-appellee.

Before MERRITT and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Plaintiff-appellant, Deborah J. Birchfield, appeals from an order of the district court granting a directed verdict in favor of defendant-appellee, International Harvester. The district court's final order in this wrongful death action followed a jury verdict in favor of the appellant in the sum of $360,000.00. The court had reserved its ruling on the defendant's motion for a directed verdict and submitted the case to the jury upon theories of negligent design and manufacture and strict liability for defective design. Following the verdict, the trial court concluded that International

Harvester could not properly be held liable under either theory. The court reasoned that a negligence theory was unavailable because International Harvester owed no duty to the decedent, and that a claim alleging strict liability for the defective design of a product was simply not cognizable under Ohio law. We find that the district court erred in granting a directed verdict on appellant's strict liability claim. Accordingly, we vacate the judgment of the lower court and remand this cause for a new trial.[1]

## I.

W.R. Grace & Company (Grace) operates a fertilizer factory in Findlay, Ohio. After the fertilizer is manufactured, it is stored in large bins to a height of eighteen feet or more. As fertilizer is needed, it is shoveled out of the bins by front-end loaders. Occasionally, the fertilizer becomes so firmly compacted in the bins that it must be blasted with dynamite before it can be shoveled out. When the fertilizer becomes compacted to that point, it will often present a sheer vertical face. If an attempt is made to shovel the fertilizer when in this condition, without first blasting the compacted material loose, the face of the pile could collapse.

In 1974 Grace bought eleven Model H25B front-end loaders from Road Builders, a dealer for International Harvester. The loaders were not equipped with overhead guards. Birchfield was an experienced payloader, with over two years of experience operating those at Grace. On November 14, 1975, William Birchfield was operating one such front end loader. That morning, Birchfield noticed that the fertilizer in the bin he was to unload was compacted,

---

1. The district court also ruled, in the alternative, that had the directed verdict not mooted the issue, it would grant the appellee's motion for a new trial. The court based this ruling on its conclusion that "the verdict is clearly so excessive that it must have resulted from passion and prejudice, and is contrary to law." The trial court has greater discretion in deciding whether or not to grant a new trial than is present in the directed verdict or judgment notwithstanding the verdict context. The former

does not deprive the parties of a jury determination and is thus viewed with less scrutiny upon appeal. While we express no view on whether the verdict should be deemed excessive, we decline to find that the trial court abused its discretion in granting a new trial on that basis. Accordingly, though we vacate the court's judgment in this case, we do not choose to reinstate the jury verdict. Rather, we remand the cause to the district court for a new trial on all issues.

presenting a sheer vertical face which would necessitate blasting. Birchfield advised his immediate supervisor that it was necessary to "shoot the pile," but indicated that there was likely enough excess on one side of the pile for a single load. The supervisor apparently told him to remove the load and then proceed to blast.

When Birchfield approached the pile of fertilizer in an International Harvester loader, the pile collapsed. A large chunk of compacted fertilizer rolled down the face of the pile and struck Birchfield in the chest. Several employees managed to pull Birchfield from the front-end loader and he was taken to the hospital in an ambulance. Birchfield died of multiple internal injuries within an hour of the accident.

On September 20, 1977, appellant, as administratrix of Birchfield's estate, filed an action in the Common Pleas Court of Hancock County, Ohio. The complaint alleged that International Harvester's failure to equip the front end loader with an overhead guard had caused Birchfield's death. International Harvester removed the action to the Federal District Court for the Northern District of Ohio, Western Division. A jury trial began on October 1, 1980.

International Harvester moved for a directed verdict at the close of the estate's case and, again, at the close of all the evidence. The jury returned a verdict in favor of the estate, awarding $120,000.00 for conscious pain and suffering and $240,000.00 for wrongful death.

Following the jury verdict, International Harvester asked the trial court to rule on its earlier directed verdict motions. The appellee also requested, in the alternative, judgment notwithstanding the verdict or a new trial. On February 4, 1981, the court granted a directed verdict in favor of International Harvester, finding, as noted above, that International Harvester could not be held liable under either a negligence or a strict liability theory.

## II.

### Strict Liability

The trial court based its judgment in favor of appellee in part on the conclusion that strict tort liability would not apply in design defect cases. The court reasoned as follows:

> There is a great dispute over the technical legal problems of whether the rule of strict liability in product liability cases extends to cases of defects in design, or only to actual physical defects in the product. The better rule seems to be that a manufacture is only liable for negligence in the design which proximately resulted in the injuries to the user.

Simply put, the district court found that the strict liability claim as framed by the appellant was not cognizable under Ohio law. Our review of the relevant case law indicates that the district court erred in reaching this conclusion. The formulation of strict liability under Ohio law clearly applies to design defect claims as fully as it does to claims of actual physical defects in the product.

Though the district court specifically relied upon *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (1977), for its holding, that case actually supports the contrary view.[2] In *Temple,* the plaintiff lost both arms below the elbow when a power punch came down on them. The plaintiff sued the manufacturer under both strict liability and negligence theories. The Ohio Supreme Court considered both. The Court noted that the plaintiff's first theory was premised upon the strict liability standard contained in Section 402A of the Restatement of Torts 2d and proceeded to expressly approve and adopt Section 402A

---

**2.** The trial court also relied upon *Gosset v. Chrysler Corp.,* 359 F.2d 84 (6th Cir.1966). That reliance is simply inappropriate *Gossett* was decided by this Court long before the Ohio Supreme Court's ruling in *Temple* and long before the development of notions of strict liability in tort in the context of Ohio products liability. *Gossett* was only concerned with, and only addresses itself to issues of *negligence* in design. The question of whether a standard unrelated to the reasonableness of the manufacturer's conduct should be employed was not before the court.

as part of the Ohio law of products liability.[3] 50 Ohio St.2d at 321–22, 364 N.E.2d 267. The court affirmed the summary judgment in favor of the defendant, however, finding that the defective condition of the press was not attributable to the manufacturer, but rather, to the substantial alterations made by the plaintiff's employer after the press had been sold. Having adopted Section 402A as the law, and having determined that it would not warrant relief in that case, the Ohio court turned to the plaintiff's claim that the press had been negligently designed. The court then found that the manufacturer had exercised reasonable care in the circumstances and refused to grant relief on the negligence basis, just as it had under 402A. The application of the negligence standard to the design question did not, however, negate the possibility of applying strict liability to that same issue in a case where no substantial change in the product can be shown. Rather, we read *Temple* as adopting Section 402A as a basis for liability in all products liability cases, no matter what the nature of the alleged defect.

Subsequent decisions of the Ohio Supreme Court clearly confirm this interpretation of *Temple*. In *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981) the Ohio court squarely held that "a cause of action for damages for injuries caused or enhanced by a product design defect will lie in strict liability in tort. (*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317 [364 N.E.2d 267] approved and followed.)" 50 Ohio St.2d at 317, 364 N.E.2d 267, Syllabus 1. In *Leichtamer,* the plaintiffs were injured while riding in a Jeep Model CJ–7 on an off the road course. The vehicle had overturned and its rollbar failed to protect the passengers. The plaintiffs claimed that the Jeep was defectively designed and the court agreed, citing *Temple* for its application of Section 402A.

International Harvester claims that *Leichtamer* was an extension of *Temple* which should not be applied "retroactively." We find this contention to be without merit. First, *Leichtamer* did not announce a new rule of law; it expressly followed the 1977 *Temple* decision. The *Leichtamer* court reemphasized that strict liability was the law in Ohio and simply went on to explain the nature of the showing required to establish its applicability in design defect cases. *See also Sours v. General Motors Corp.*, 717 F.2d 1511 (6th Cir.1983); *Knitz v. Minster Machine Co.*, 69 Ohio St.2d 460, 462–65, 432 N.E.2d 814 (1982). Furthermore, the *Leichtamer* court itself did not limit its holding to prospective application. Rather, the court affirmed an award of damages for an accident which had occurred in April, 1976, with that award based solely on strict liability for a defective design.

The Ohio Supreme Court's most recent statement on the issue reemphasizes both that Section 402A has been the law in Ohio since *Temple* and that the Ohio Courts do not limit their products liability developments to accidents which occur or products which are manufactured at later dates. *Knitz v. Minster Machine Co.*, 69 Ohio St.2d 460, 432 N.E.2d 814 (1982). In *Knitz,* the plaintiff claimed that the defendant's press was defective because its design allowed accidental tripping of the foot pedal control and failed to provide a guard which would prevent injury whenever the foot pedal was

---

**3.** Section 402A (2 Restatement of Torts 2d 347) reads as follows:

Special Liability of Seller of Product for Physical Harm to Consumer.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule in subsection (1) applies although

(a) the seller has exercised all possible care in the sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

operative. The court analyzed Ohio law, explaining that *Temple* firmly established the strict liability principle and that *Leichtamer* clarified the nature of the burden upon the plaintiff when attempting to establish strict liability in a design defect case. 69 Ohio St.2d at 462–65, 432 N.E.2d 814. The court proceeded to develop an alternative standard of defectiveness for situations in which the *Leichtamer* consumer expectations test would be insufficient and applied that standard to an accident which had occurred in 1976 and which was the subject of a 1978 summary judgment motion. It appears, therefore, that there is no real retroactivity issue and, to the extent that one arguably exists, the Ohio courts have resolved it—favoring retroactive application of developments in the law of products liability.

Based on these clear statements of Ohio law, we are convinced that the district court's interpretation of *Temple* was incorrect and that, even if it were not, the Ohio Supreme Court's subsequent statements in *Leichtamer* and *Knitz* would apply with full force to this case on appeal.[4] Accordingly, the trial court's conclusion that the strict liability issue was not cognizable under Ohio law is erroneous and a judgment should not have been entered in favor of the appellees on that basis.

International Harvester argues, in the alternative, that even if strict liability is a viable cause of action in pre-*Leichtamer* design defect cases in general, it should be unavailable in the present case because of the appellant's failure to show that the design was "unreasonably dangerous," as required under Section 402A. The appellee is correct in noting that the Ohio Supreme Court originally adopted Section 402A of the Restatement of Torts 2d *along with* its attendant comments. See *Temple, supra; Leichtamer, supra.* The appellee is also correct in the assertion that comments (g), (i) and (j) of the Restatement, together establish the requirement that an article or product be in an "unreasonably dangerous condition" before it is to be deemed defective. It does not follow from these assertions, however, that strict liability is an unavailable basis for liability in this case.

■ First, the appellee's characterization of the "unreasonably dangerous condition" requirement as a negligence standard, to be applied with an eye toward the conduct of the manufacturer, is clearly incorrect. Strict liability, by definition, is unconcerned with standards of behavior on the part of the manufacturer. The very comments from the Restatement which International Harvester cites emphasize that the presence or absence of unreasonable danger is to be determined by reference to the knowledge of the user, not to the conduct of the manufacturer. The Ohio Supreme Court clearly adopted a user-oriented test in *Leichtamer* when it held that "[a] product will be found unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably forseeable manner." 67 Ohio St.2d at 467, 424 N.E.2d 568. The court did *not* include any considerations of the manufacturer's negligence in the calculation of unreasonable danger.

■ In addition, International Harvester's claim that the unreasonable danger element can not be satisfied in this case *even if* the manufacturer's negligence is irrelevant to that determination is also insufficient to justify affirmance of the district court. Under a pure consumer expectations test, as applied in *Leichtamer,* the issue of whether the danger posed by the

---

4. To the extent that dicta in *Drayton v. Jiffee Chemical Corp.,* 591 F.2d 352 (6th Cir.1978) reads *Temple* for the proposition that a manufacturer is only liable for defects in the design of a product where it was negligent in creating that design, that interpretation of *Temple* has since been rejected by the Ohio Courts themselves. In diversity cases *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), demands that this Court follow state law as it is interpreted by the highest court of that given state. Hence, we are required to read *Temple* as the Ohio Courts have explained it is to be read in *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568 (1981) and *Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460, 432 N.E.2d 814 (1982).

absence of the overhead guard was "beyond the expectations of an ordinary consumer" would normally be one for the jury, following appropriate instructions from the trial court. Since a review of the record reveals no instruction on the issue, we are unable to conclude that the jury verdict in favor of the appellant reflects a proper resolution of it. This does not, however, require this Court to resolve the issue in the first instance, as the appellee urges. While the absence of a proper instruction on unreasonable danger may have justified a remand to the district court were the jury verdict permitted to stand, it does not justify a complete removal of the issue from jury consideration. Hence, the proper method of dealing with the appellee's claim that the danger posed was not beyond Birchfield's expectations under *Leichtamer* is through submission of the issue to the jury upon retrial. We note that the test to be applied by the jury in this context is an objective one, to be examined with an eye toward the expectations of an "ordinary consumer." *See e.g. Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460, 465, 432 N.E.2d 814 (1982).

■ Moreover, it is clear from the recent developments in Ohio law that the presence or absence of a design defect is no longer to be measured solely by reference to consumer expectations. Instead it initially focuses upon the product. The Ohio Supreme Court has recently adopted a risk-benefit test to be employed in situations in which an ordinary consumer would not necessarily know what to expect from a product. *See Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460, 432 N.E.2d 814 (1982). The Ohio court recognized that in certain circumstances, particularly where use of an industrial or non-consumer oriented product is concerned, an ordinary consumer may be unable to form clear expectations regarding any danger involved. The court reasoned that in such situations the jury should be given an alternative talisman from which to measure the defectiveness of a product:

> Unlike the factual setting in *Leichtamer*, there are situations in which the consum-

er would not know what to expect, because he would have no idea how safe the product could be made. Such is the case *sub judice....* In such cases, the policy underlying strict liability in tort requires that a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product design embodies excessive preventable danger or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefit in such design.

> Accordingly, we hold that a product design is in a defective condition to the user or consumer if (1) it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably forseeable manner, or (2) if the benefits of the challenged design do not outweigh the risk inherent in such design. Factors relevant to the evaluation of the defectiveness of the product design are the likelihood that the product design will cause injury, the gravity of the danger posed, and the mechanical and economic feasibility of an improved design.

*Id.* at 465–66, 432 N.E.2d 814 (citations omitted). Accordingly, it is clear that upon remand the issue of the defectiveness of the payloader must now be considered in light of the *Knitz* formulation of the defectiveness standard and, thus, that the appellee's consumer expectations arguments only deal with a portion of the legal issue involved under Ohio law.

The judgment entered by the trial court is hereby VACATED and this case REMANDED for a new trial in keeping with this opinion.

WEICK, Senior Circuit Judge, dissenting:

I respectfully dissent. The gist of plaintiff's action was that the front-end payloader trucks manufactured by the defendant, International Harvester Company (International) and purchased by Grace from International's dealer, were defectively designed in that they did not come equipped with overhead guards, which plaintiff contends would have prevented the accident.

The answer for this is that Grace's order provided detailed specifications for the loaders it was purchasing, which specifications were accepted by International and did not include any overhead guards. These guards were treated by International as accessories or optional equipment and could have been purchased by Grace for an additional cost of $500 per unit. Since Grace ordered 11 units, it would have been required an additional expenditure of $5,500. In its order, Grace, the customer, specifically did not request overhead guards on any of the 11 front-end loaders which it purchased from International, yet the plaintiff seeks to blame International for not supplying them, which would be in violation of the provisions of the order. International could not have collected the purchase price of the overhead guards if it had supplied them when not ordered. International was never advised of the uses which Grace would make of the loaders. It would seem that the plaintiff should blame Grace for not ordering the overhead guards and not International, which would have violated its sales agreement by supplying unordered items. A photograph of the payloader is appended hereto (A. 979a).

American National Standards for Powered Trucks, ANSI, B56.1–1969, which were admitted to be applicable, expressly provides in Section 421 as follows:

421 Overhead Guard

High-lift Rider trucks *shall be fitted* with an overhead guard *unless the customer otherwise requests* ... It is impractical to build a guard of sufficient strength to withstand the impact of a falling capacity load since such a guard would constitute a safety hazard because its structure would be so large that it might interfere with good visibility, and would weigh so much that it might make the truck top-heavy and unstable. (Emphasis added).

Grace, the customer, otherwise requested by not ordering that any of the 11 loaders be equipped with overhead guards. No proof was offered to the effect that even if the loader had been equipped with an overhead guard, that it would have withstood the heavy crushing load falling upon the decedent and prevented his injury and death. Also, as hereinafter shown, the decedent was misusing the equipment at the time.

This appeal presents only questions of Ohio law as the controlling facts were uncontroverted.

## A.

### The Facts

Plaintiff-Appellant's decedent was employed as a laborer at the Findlay, Ohio, fertilizer plant of Grace. He had worked there for several years, both before and after military service. The last period of employment was for approximately two years, ending with his death on November 14, 1975.

The fertilizer plant of Grace was a big operation, and great quantities of fertilizer were stored in very large bins. The bins were filled with fertilizer to a height of eighteen feet or more. As fertilizer was needed, it was shovelled out of the bins by front-end loaders. It was not unusual for the stored fertilizer to become so firmly compacted in the bins that it had to be blasted with dynamite before it could be shovelled out. When the fertilizer became compacted, it would often present a sheer vertical face. Such a face could, and often did, collapse, if an attempt was made to shovel the fertilizer out without blasting. The employees were aware of this hazardous condition, and were instructed not to enter the bins with front-end loaders to work on such vertical faces, but did not always obey these instructions, even though they were aware of them.

On November 14, 1975, early in the morning, the decedent was using a front-end loader manufactured by the defendant which was one of a number of machines that had been ordered by Grace from defendant through a dealer. It had been delivered in May of 1974 to Grace's plant at Findlay, and used there since. It was built

to Grace's specifications, according to the instructions on Grace's purchase order.

The loader had no overhead shield or guard, although the defendant supplied such guards as optional equipment to purchasers of its loaders. The shields manufactured by defendant conformed to all safety standards for such shields. The undisputed evidence showed that it is not possible to use shields on all front-loaders, because such loaders are designed to be used in cramped quarters where the shields would encounter obstruction, as well as in open places where they would not. The evidence was also undisputed that the defendant had no knowledge, and was not informed by Grace or by the dealer who sold the machines, of the purposes for which they were to be used.

In any event, on the day in question, the decedent decided to get a load of fertilizer from a bin in which compacted fertilizer presented a vertical face some eighteen feet high, with a small quantity of loose fertilizer at one corner of its base. The fertilizer in this bin was due to be blasted, or "shot," to use the employees' term, but decedent did not wait for the blasting. He went into the bin and ran his front-end loader against the base of the pile of fertilizer, which collapsed, burying the loader, and decedent up to his waist. A large chunk of fertilizer, variously described as from sixteen inches in diameter to three and one-half by two and one-half by two feet, rolled down the collapsing face of the pile of fertilizer and struck the decedent in the right chest. The evidence was totally devoid of any indication of the weight of the chunk of fertilizer.

With some difficulty, the decedent was extracted from the front-end loader. An ambulance had been called about 7:35 A.M. Decedent was conscious but confused. He was taken by the ambulance to the local hospital, entering the emergency room at 8:05 A.M. Within five to ten minutes decedent lapsed into unconsciousness. He died thirty-five minutes after entering the emergency room. An autopsy showed death was the result of internal injuries, including lacerations to the aorta and the liver.

## B.

### The Trial Judge Properly Directed a Verdict

Plaintiff's only basis for claiming that the payloader was defective rested on the alleged violation of ANSI Standard B56.1–1969 and the expert testimony of Dr. Guenther. The opinion of an expert witness that a product is defective is not determinative. In *Orfield v. International Harvester Company*, 535 F.2d 959 (6th Cir.1976), this court affirmed a directed verdict for the manufacturer where it was alleged that a bulldozer without a protective canopy was defective. The court held that the opinion of an expert witness that the bulldozer was defectively designed and unreasonably dangerous without a canopy was not determinative and did not require the district court to submit the issue to the jury where his opinion was not supported by the evidence.

In the present case, Dr. Guenther's opinion warrants very little weight for a number of reasons. He never physically examined the payloader in question; he never spoke with any witnesses; he never visited the site of the accident; and he has no experience with the design, manufacture, or marketing of a payloader. In fact, he failed to comply with his own guidelines in such matters (A. 467–71).

This court has affirmed directed verdicts for manufacturers in the past. *E.g. Keet v. Service Machine Company, Inc.*, 472 F.2d 138 (6th Cir.1972); *Gossett v. Chrysler Corporation*, 359 F.2d 84 (6th Cir.1966).

## C.

### Strict Liability Does Not Apply to a Defective Design Claim in Ohio

In *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977), the Ohio Supreme Court adopted Restatement of Torts § 402A, but limited it to defective products. It reiterated that the general rule in Ohio concerning defective product design is a negligence standard. This court has so construed *Temple* in *Drayton v. Jif-*

fee Chemical Corp., 591 F.2d 352, 357 (6th Cir.1978).

Subsequent to Judge Young's opinion in the instant case (February 4, 1981), the Ohio Supreme Court decided *Leichtamer v. American Motors Corporation,* 67 Ohio St.2d 456, 424 N.E.2d 568 (1981). *Leichtamer* extended the strict liability theory to defective design cases. However, *Leichtamer* should not be applied retroactively in the instant case, and it is distinguishable on its facts in any event. In *Leichtamer* the plaintiff relied on a safety device which proved to be defective; here, there was no safety device present, therefore the decedent could not have been misled as to the dangers involved in operating a payloader without an overhead guard.

In any event, the payloader was not "unreasonably dangerous to the user" within the meaning of Section 402A of the Restatement of Torts. Ohio case law has acknowledged that, in a defective design case, there is no practical difference between strict liability and negligence. The test for an "unreasonably dangerous" condition is equivalent to a negligence standard of reasonableness, therefore a manufacturer has a duty to exercise reasonable care to design a product that will be reasonably safe for its intended use. *Jones v. White Motor Corporation,* 61 Ohio App.2d 162, 401 N.E.2d 223 (1978). In *Anton v. Ford Motor Company,* 400 F.Supp. 1270, 1278–80 (S.D.Ohio 1975), the court noted that the elements of "unreasonably dangerous to the user" of Section 402A involve traditional negligence principles concerning the duty of the manufacturer to design a reasonably safe product.

Comments g and i to Section 402A of the Restatement show that "unreasonably dangerous" means more dangerous than the ordinary consumer would expect. In *Orfield v. International Harvester Company,* 535 F.2d 959 (6th Cir.1976), this court held that a bulldozer without a protective canopy was not defective or unreasonably dangerous because the plaintiff was an experienced bulldozer operator and was aware of the dangers involved in operating a bulldoz-

er without a canopy. The same applies in the present case. William Birchfield was an experienced payloader operator. He knew that the payloader did not have an overhead guard, and he realized the dangers of ramming a tall pile of fertilizer.

In light of the above, the trial court could come to but one conclusion, that the payloader was not unreasonably dangerous under Section 402A, and that International Harvester was not negligent in designing it.

### D.
### International Harvester Complied With Industry Standards

Judge Young correctly ruled as a matter of law that International Harvester had not violated industry standards concerning overhead guards on payloaders. The overwhelming weight of the testimony at trial established that International Harvester complied with ANSI B56.1–1969.

The standard does not say that an overhead guard must be installed by the manufacturer as standard equipment. What it says is that a manufacturer must fit the equipment with the capacity to have an overhead guard installed at the user's option. International Harvester complied with this requirement by equipping the payloader with brackets welded to the unit, suitable for mounting an optional overhead guard (A. 568).

Further, the standard expressly relieves the manufacturer of any obligation to install an overhead guard if the customer so indicates. The purchase order submitted by Grace to the International Harvester dealer from whom the payloaders were purchased was for eleven payloaders with standard equipment plus two optional accessories. (A. 31). Nothing was mentioned about overhead protection. The silence of Grace concerning overhead guards could reasonably be construed by International Harvester as an order to delete the guards. Therefore, the standard was complied with.

The payloader was not an assembly line product, but was built to order according to Grace's specifications (A. 484–85). The cus-

tom of the industry in 1974 was to rely on the customer to specify the optional safeguards that were to be installed on the unit. A manufacturer is not liable for failing to install an optional safety device on a product that has been manufactured in accordance with the specifications of the purchaser. In *Orfield v. International Harvester,* 535 F.2d 959 (6th Cir.1976) this court affirmed a directed verdict for the defendant-manufacturer of a bulldozer that was not equipped with an overhead safety canopy. The court concluded that the manufacturer of a bulldozer had satisfied its obligations by making the canopy available as an option and then informing the customer of the availability of the option. We ought to follow our own opinions.

### E.

### International Harvester Was Not Negligent

Noncompliance with federal or industry standards is not negligence *per se.*

It is not sufficient merely to prove that the payloader was defectively designed; it must also be shown that the alleged defect was the proximate cause of the fatal accident. In this case, the omission of an overhead guard on the payloader was not the proximate cause of Mr. Birchfield's injuries. According to the ANSI Standard, Section 504 (page 1137, supra) the overhead guard is not intended to withstand the impact of a falling capacity load. Three witnesses testified that after the cave-in, the firmly compacted fertilizer covered the tires on the

payloader, the entire front of it, and filled the cockpit up to Mr. Birchfield's chest. Given that amount, appellant failed to prove that an overhead guard would have withstood such an impact, and therefore has failed to prove that the absence of the overhead guard was the proximate cause of the fatal injuries.

The negligence of Grace in not ordering overhead protection on the payloader was an intervening and superseding cause of Birchfield's death. Grace knew the working conditions at the plant, and it knew that payloader operators were given to ramming the piles of fertilizer even though it was dangerous, but it did little or nothing to prevent them from doing this. It had 18 months to inspect the payloader and observe its use from the time it arrived to the time of the accident, but it never ordered any overhead guards. Clearly, the negligence of Grace supersedes any negligence on the part of International Harvester.

Plaintiff's decedent assumed the risk of injury by his negligent misuse of the payloader. He violated company instructions by using it on the compacted fertilizer before it was dynamited. He was aware of the dangers of ramming a tall pile of fertilizer with a payloader, but he did it anyway. The payloader was not designed or intended for that. This misuse precludes appellant's claim for defective design. *Calvert Fire Insurance Company v. Fyr-Fyter,* 67 Ohio App.2d 11, 425 N.E.2d 910 (1979).*

I would affirm the judgment of District Judge Young.

---

\* A motion to Certify the record was overruled by the Supreme Court of Ohio, January 17, 1980.

# a real workhorse by anybody's standard

**H-25B PAY LOADER**
breezes through 6'1" openings—unloads boxcars 2,500 lbs. at a time with elbow room to spare. Enclosed components "seal" the H-25B from its working environment—enable it to work in extremely dusty atmospheres.

979a