OPINION
Defendant-Appellant, Anthony Saxton, appeals a judgment of conviction by the Marion County Common Pleas Court finding him guilty of aggravated murder, in violation of R.C. 2903.01(B), aggravated arson, in violation of R.C. 2909.02(A)(2), and aggravated burglary, in violation of R.C.2911.11(A)(1).
Appellant claims that there was insufficient evidence to support his conviction, which, in turn, should have supported his motion for acquittal, and that the convictions were against the manifest weight of the evidence. However, based upon an abundance of circumstantial evidence coupled with Appellant's numerous contradictory statements to the police during their investigation, we find that the evidence was sufficient to warrant conviction, and as such, the convictions were not against the manifest weight of the evidence.
Appellant also asserts that the State's expert witness's testimony concerning an out-of-court experiment and his wife's testimony regarding threats he allegedly made just days before the crime should have been excluded. The expert's testimony was probative, however, to determine the solubility of magazine ink that had left a clear impression on Appellant's shoe, and any dissimilarities between the experiment and the actual events went to the weight of the evidence, not its admissibility. Furthermore, Appellant's wife's testimony was probative of Appellant's motive behind the crimes, and any potential prejudice was cured by cross examination of the witness about her prior inconsistent statements.
The record further does not support Appellant's contentions that the State engaged in prosecutorial misconduct, that his attorneys provided ineffective assistance of counsel, or that his motion for a new trial should have been granted. The State did not inaccurately state the evidence in closing arguments, and the State is free to comment on Appellant's failure to call witnesses to support his case; thus precluding Appellant's claim of prosecutorial misconduct. Appellant's attorneys' failure to seek a continuance in order to locate an alibi witness did not rise to the level of ineffective assistance of counsel because the record does not indicate what the testimony would have been had the witness testified at trial, and there is not a reasonable probability that the outcome would have changed had the witness testified. However, the failure to request a continuance did preclude the granting of a new trial based upon newly discovered evidence because Appellant did not use due diligence prior to trial in attempting to procure the testimony.
The facts leading to Appellant's appeal are as follows. On Saturday, July 3, 1999, Appellant and his wife, Pamela Saxton, argued about her refusal to leave Appellant the keys to her car while she went out of town to visit family. She left the car at her mother and daughter's house and locked the keys to the car in her mother's bedroom without telling anyone. Thereafter, she and her mother left, leaving her daughter, Taranda Braddy, at home alone.
On Wednesday, July 7, 1999, the Marion, Ohio Fire Department was dispatched to Taranda Braddy's house in response to a fire. Once a majority of the fire was extinguished, Taranda's body was found lying on the bed in her upstairs bedroom. The coroner determined that she had died of strangulation before the fire was set. Investigators determined that the fire was intentionally set using gasoline as an accelerant.
Appellant arrived at the scene later that morning and was approached by investigating officers. Thereafter, he consented to a search of his home located approximately one mile from the scene of the crime. During the search, officers found potential evidence linking Appellant to the crimes. Appellant was later arrested for an unrelated parole violation, and the investigation surrounding Taranda Braddy's death continued.
During the investigation, Appellant never accounted for his whereabouts between the times the crimes were committed and continually gave conflicting statements to the police. Furthermore, an abundance of circumstantial evidence was recovered linking Appellant to the crime. Consequently, on July 29, 1999, Appellant was indicted on one count of aggravated murder, one count of aggravated burglary, and one count of aggravated arson.
On March 8, 2000, after a two-week jury trial, Appellant was convicted on all counts. Subsequently, Appellant filed a motion for acquittal and a motion for a new trial, which were both denied after a hearing on the motions. On September 22, 2000, Appellant was sentenced to life imprisonment for aggravated murder, ten years imprisonment for aggravated burglary, and eight years imprisonment for aggravated arson; all terms to be served consecutively.
From this conviction and sentence, Appellant brings his appeal and raises nine assignments of error for our review. For purposes of brevity and clarity, we will not be addressing them in the order in which they were assigned.
 Assignment of Error II The record contains insufficient evidence to support Defendant-appellant's conviction.
 Assignment of Error VIII The trial court erred to the prejudice of Defendant-appellant by denying Defendant-appellant's post trial motion for acquittal.
 Assignment of Error I Defendant-appellant's conviction is contrary to the manifest weight of the evidence.
Appellant challenges the sufficiency of the evidence in his second assignment of error and the weight of the evidence in his first assignment of error. In his eighth assignment, he avers that the trial court erred by denying his Crim.R. 29 motion for acquittal. Because these assignments are sufficiently related, we will address them together.
The relevant inquiry for reviewing a denial of a Crim.R. 29 motion is the same as the inquiry for sufficiency of the evidence.[1] To reverse a conviction for insufficient evidence, we must be persuaded, after viewing all of the evidence in a light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[2] The elements necessary for a conviction of aggravated murder in this case include that Appellant purposefully caused another's death while committing or attempting to commit kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, or escape.[3]
Likewise, for a conviction of aggravated arson, the State must prove that Appellant knowingly caused physical harm to an occupied structure by means of fire.[4] And, aggravated burglary requires proof that Appellant trespassed in an occupied structure by force, stealth, or deception when another person was present with the purpose to commit any criminal offense and that physical harm was inflicted upon another.[5]
Appellant contends that the evidence adduced at trial was insufficient to maintain his convictions. Based upon the following, we disagree.
The State's case herein was based solely upon circumstantial evidence. No direct evidence was presented that placed Appellant at the scene of the crime; however, the Ohio Supreme Court has held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value."[6] Therefore, regardless of whether the evidence is comprised of direct or circumstantial evidence, the standard of review for sufficiency of the evidence is the same.[7]
Testimony at trial revealed that the victim died as a result of strangulation before the fire was set. The coroner testified that while the precise time of the victim's death could not be accurately pinpointed due to the burn damage to the body, evidence revealed that the victim was killed between 2:00 a.m. and 6:00 a.m. Arson investigators testified that the fire was intentionally set with a gasoline accelerant based upon the burn patterns found in the upstairs of the house, a gas can found at the top of the stairs, and samples of the upstairs carpet that tested positive for gasoline. Testimony also indicated that there was no forced entry into the house and nothing was taken from the premises.
Less than seven hours after the fire was reported, Appellant gave investigators consent to search his home. In his upstairs bathroom, officers found several articles of clothing soaking in the bathtub. Testimony revealed that the clothes included two pairs of men's underwear, a pair of shoes, a t-shirt, a jacket, a pair of denim shorts, and a yellow mesh outfit consisting of a pair of shorts and a shirt. Officers testified that they smelled gasoline emanating from the tub and the smell of a strong detergent. Next to the tub, officers found an almost completely empty bottle of Purex. Testimony indicated that Appellant told them the clothes had been in the tub since he worked at the county fair dismantling rides in the late hours of July 4th to the early morning hours of July 5th.
Results of scientific testing revealed that traces of gasoline were present on either the denim shorts or the shoes. Which specific item contained the gasoline could not be determined because those articles were packaged together and were possibly cross contaminated. On July 13th, Appellant told the police that the denim shorts were soaking in the bathtub because he accidentally had diarrhea while wearing them, although the State's scientific testing revealed no traces of feces, and Appellant also stated that he may have washed his hands with some gasoline from his neighbor after working at the fair. Neither of these statements were given to police in any of the prior interviews with Appellant, and in prior statements Appellant specifically stated that no gasoline would be found on his clothes.
Investigators also discovered that one of the shoes found in the bathtub had a perfectly transferred impression of a magazine advertisement on its sole. The magazine was later confiscated from Appellant's home. The advertisement that transferred to the shoe was located in an issue that did not arrive in Marion until Tuesday, July 6th, which contradicted Appellant's statement that the clothes and shoes had been in the bathtub since the early morning of July 5th. Witnesses also indicated that Appellant had worn the yellow outfit and the shoes found in the tub the day before the murder.
The first fire and police personnel who arrived at the scene of the crime in the morning hours of July 7th noticed a single track in the dew of the grass, apparently left by a bicycle, that lead from the front of the house to the dirt alley behind the house. The only break in the track was over a portion of the driveway located on the side of the residence. Later that day, a stolen bicycle was recovered four houses away from Appellant's house, and plaster casts of tire tracks made in the alley running behind the victim's house closely resembled one of the tires on the stolen bike and did not match any of the approximately 125 bicycles that were in the custody of the Marion Police Department at the time of the murder. Further testimony indicated that the bicycle was stolen approximately half-way between Appellant's house and the scene of the crime and was stolen sometime after 11:00 p.m. on July 6th and deposited near Appellant's house before 6:30 a.m. on July 7th. Moreover, a blue cotton fiber consistent with denim material was found on the seat of the bicycle, and an eyewitness saw a black male riding a bicycle at 5:50 a.m. in the direction of Appellant's home; however, the witness could not identify Appellant and stated that the man on the bike had on long pants.
Appellant's wife, Pamela Saxton, testified that she and Appellant had engaged in a heated argument over her prohibiting Appellant's use of her car while she was out of town. Appellant's statements to the police corroborated this testimony. She indicated that when Appellant realized that the car would be left at the victim's house, he threatened to blow up the car and burn down the house. Her testimony also revealed that Appellant was more angry than she had ever seen him. Pamela further stated that Appellant had previously never washed his clothes in the bathtub aside from occasionally using the bathtub to wash underwear.
During the course of the investigation, Appellant never accounted for his whereabouts during the hours of 3:00 a.m. to 6:00 a.m. on July 7th, the times between which the crimes were committed. Appellant initially told police that he was in bed by 2:30 a.m. and was then awakened by his mother's arrival around 3:00 a.m., after which they sat up talking. Thereafter, Appellant told police that he had left the house to make a phone call to his girlfriend around 3:00 a.m. and missed the arrival of his mother who was waiting in her rented U-Haul truck. These statements were not given until after the police told him that his prior statement indicating that he called his girlfriend from his house on the night of the murder did not correlate with the fact that he had a long distance block on his home phone. The telephone records from the pay phone he used indicated that the call was placed at 2:51 a.m. on July 7th. Appellant also initially told another witness that on the night of the crime he had gone to Cleveland to pick up his mother and drive her back to Marion. This was refuted by the testimony of a police officer who gave Appellant's mother directions to Appellant's house at around 3:00 a.m. on the morning the crimes were committed. Pamela Saxton testified that Appellant originally stated that his mother was outside waiting in the U-Haul truck until 6:00 a.m. but later claimed that he let her in by 4:00 a.m. Pamela also indicated that several months after the crime Appellant asserted for the first time that another woman was with him at his house on the night of the crime, and she left out the back door while Appellant was letting his mother in the front door; however, no testimony at trial corroborated this account of events.
Another State witness testified to a statement made by Appellant, which inferred that Appellant knew facts about the case that only the perpetrator could have known. Following the murder, Appellant stated to a friend over the phone that the victim was strangled before the fire was set; however, this statement was made before the police had publicly announced the cause of death. The investigating officer monitoring this phone conversation did not know the cause of death at that time. Appellant claims that he heard the information from a cellmate who was told the cause of death from one of the investigating officers.
Based upon the foregoing evidence presented by the State, we find that a rational trier of fact could have concluded that Appellant committed the crimes for which he was convicted beyond a reasonable doubt. Therefore, we overrule Appellant's second and eighth assignments of error.
We now turn to discuss Appellant's contention that the jury verdict was against the manifest weight of the evidence. The standard to apply when reviewing such a claim has been set forth as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[8]
Furthermore, an appellate court should grant a new trial only in an exceptional case "where the evidence weighs heavily against the conviction."[9] This is not such a case. A complete review of the record herein does not lead this court to conclude that the jury clearly lost its way in rendering a guilty verdict.
Consequently, Appellant's first assignment of error is not well taken and is overruled.
 Assignment of Error III The trial court erred to the prejudice of Defendant-appellant by allowing the testimony of Michelle Yezzo regarding the paper to paper transfer experiment.
At trial, the State's expert witness, Michelle Yezzo, testified to the results of an experiment she conducted in order to determine the solubility of the ink used in the magazine that had left a clear impression on one of Appellant's shoes found during the day of the murder. The experiment revealed that gasoline clearly transferred the ink from the magazine to a piece of white bond paper, whereas the dry magazine or the use of water did not transfer the ink onto the paper. Appellant contends in his third assignment of error that the experiment was not representative of how the ink transferred to the shoe because it was conducted using bond paper instead of a shoe, and therefore, the testimony should have been excluded because the experiment lacked probative value and was unduly prejudicial. Appellant does not contend, however, that Michelle Yezzo lacked the qualifications to testify as an expert or that the methods utilized to conduct the experiment were unreliable.
As an initial matter, we note that the admission of expert testimony is a matter generally within the discretion of the trial court and will not be disturbed absent an abuse of discretion.[10] An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary.[11]
For the reasons that follow, we find that the trial court did not abuse its discretion in allowing Michelle Yezzo's testimony concerning the experiment.
The Ohio Supreme Court has held that when an out-of-court experiment is not represented to be a reenactment of a given situation and instead relates to one aspect or principle directly associated to the cause or result of the occurrence, the exact conditions of the situation need not be duplicated.[12] Herein, the experiment was utilized to test the solubility of the magazine ink and whether gasoline would clearly transfer the ink on to another surface, not to recreate the actions taken to transfer the impression on to Appellant's shoe. As such, the solubility of the magazine ink is directly associated to how a clear impression of the magazine is able to transfer to other surfaces. For these reasons, the testimony was probative.
Additionally, we find that the testimony was not unduly prejudicial. Evid.R. 403(A) states that, "although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice[.]" The rule favors admission unless the risk of prejudice is so substantial that a jury cannot properly evaluate it.[13] The testimony elicited upon the State's direct examination and Appellant's cross examination of Michelle Yezzo informed the jury of the dissimilarities between the experiment and the actual events. Furthermore, Appellant rebutted the testimony with his own expert who used a shoe to conduct his experiment. Though he found that the ink transferred dry or with water, he was unable to testify to whether any words or letters clearly transferred. The dissimilarity of the State's experiment to the actual events, therefore, goes to the weight, not the admissibility of the evidence.[14] Consequently, Appellant was not unduly prejudiced by the expert testimony.
In light of the foregoing, we overrule Appellant's third assignment of error.
 Assignment of Error IV The trial court erred to the prejudice of Defendant-appellant by allowing the testimony of Pamela Saxton about an alleged threat to set the house on fire.
In his fourth assignment of error, Appellant maintains that the trial court erred by allowing testimony of Pamela Saxton concerning threats made by Appellant a few days before the crime that he would burn down the victim's house. Appellant claims that because Pamela never mentioned the specific threat she stated during the trial in any prior statements to the police, it should have been excluded as it lacked credibility and was unduly prejudicial.
The testimony concerning the threats were directly related to the State's theory of the motive behind the crimes; namely, that Appellant wanted use of Pamela's car, which she had left at the victim's house while she went out of town. Though the testimony was admissible as proof of motive under Evid.R. 404(B), Appellant contends that the trial court should have excluded the evidence because its probative value was substantially outweighed by the danger of unfair prejudice.[15]
Because Appellant's alleged threats occurred just days before the crimes were committed, were specifically directed toward the victim's home, and bear a direct correlation to Appellant's motive, we do not find that their probative value was substantially outweighed by the risk of unfair prejudice.
Moreover, though Pamela had never mentioned the specific threat that was elicited upon direct examination before trial, the recentness of the statement and potential inconsistencies in Pamela's prior statements to the police and her trial testimony were effectively inquired into on cross-examination. The weight of the evidence and the credibility of witnesses are primarily left for the trier of fact;[16] thus, as the trier of fact, the jury was free to determine the veracity of the testimony, and there was no prejudicial error in its admission. Accordingly, Appellant's fourth assignment of error is hereby overruled.
 Assignment of Error V Prosecutorial misconduct rendered Defendant-appellant's trial fundamentally unfair in violation of the Constitutions of Ohio and the United States.
Appellant claims in his fifth assignment of error that the State engaged in prosecutorial misconduct at several points during the trial. He first asserts that the State's failure to disclose to Appellant that Pamela Saxton was going to state for the first time at trial that Appellant had threatened to burn down the victim's house constitutes prosecutorial misconduct. However, Crim.R. 16, which controls discovery for criminal cases, specifically states that "statements made by witnesses or prospective witnesses to state agents" is not discoverable.[17] Moreover, there is nothing in the record that indicates the State was aware that she would be testifying differently than her pre-trial statements. Therefore, the fact that Pamela gave inconsistent statements before and during trial as to the exact wording of Appellant's threats does not constitute prosecutorial misconduct.
Appellant also maintains that the State inaccurately recited the trial testimony during closing arguments. Specifically, Appellant asserts that the State commented during summation that nothing had been taken from the victim's house on the night of the murder, which he claims is inaccurate because testimony did indicate that the victim's pager was never recovered. As a threshold matter we note that Appellant did not object to these statements; accordingly, the issue of whether the comments constituted prosecutorial misconduct were not properly preserved for our review upon appeal.[18]
Notwithstanding Appellant's failure to preserve the issue for appeal, we find that the State's comments did not constitute prosecutorial misconduct. In order to find prosecutorial misconduct, we must first determine whether the prosecutor's remarks were improper; if so, we then consider whether the remarks prejudicially affected substantial rights of the accused.[19] Additionally, we note that the State is entitled to a certain degree of latitude during closing arguments[20] and is free to draw reasonable inferences from the evidence presented at trial, which may be commented on during closing argument.[21]
At trial, the victim's grandmother, Tiny Braddy, who owns and also resides in the house where the crimes were committed, testified that nothing had been removed from the house on the night of the murder. Further testimony from one of the investigating officers indicated that the victim's pager was never recovered. Because there was evidence that nothing was taken from the residence and because the officer's testimony did not conclude that the pager was taken, we do not find that the prosecution's statements were improper.
Finally, Appellant argues that the State also made improper statements during its rebuttal closing argument. Appellant objected to the following statement:
 You see both sides have an opportunity to subpoena witnesses in this case and both sides exercised that option to do that. If there's anyone to help account for this Defendant's presence, you can bet the Defendant would subpoena them in here.
The Ohio Supreme Court has held that the State is not prevented from commenting upon the failure of the defense to offer evidence in support of its case.[22] Consequently, comments that a witness other than the accused did not testify are not improper.[23] As such, the State's comments did not constitute prosecutorial misconduct.
For these reasons, we overrule Appellant's fifth assignment of error.
 Assignment of Error VI Defendant-appellant received prejudicially ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights, as well as his rights under Section 10, Article I, Ohio Constitution [sic].
Appellant avers that his counsel was ineffective because they failed to procure a potential alibi witness to testify at trial. A claim for ineffective assistance of counsel requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result.[24] To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different:[25]
"reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.[26] Based upon the following rationale, we find that Appellant was afforded effective assistance of counsel.
Shortly before trial Appellant informed his counsel of a potential alibi witness. Because Appellant could only provide a nickname for this witness, his counsel hired a private investigator to identify the witness's true name and her whereabouts. Five days before trial a subpoena was issued in hopes to procure this witness's testimony at trial; however, because Appellant's counsel did not have the correct name or address of the potential witness, the subpoena was issued under the name Denise Bonds instead of Donna Bonds and was not issued to her address. As such, the witness did not appear at trial.
Thereafter, Appellant's counsel located the witness, and in support of Appellant's motion for a new trial, Appellant's counsel produced two affidavits from Donna Bonds. The first affidavit stated that Donna was with Appellant at his house on the night of the murder and left out the back door while Appellant was letting his mother in the front door. The second affidavit was drafted to affirm the first because during the interim between the two affidavits, investigating officers from the Marion Police Department took a certified statement from Donna, indicating that the sworn affidavit she initially gave was false and that she had signed the affidavit without reading it. At Appellant's hearing for a new trial, Donna was called to testify; however, because there was a risk that she may testify contrary to her sworn affidavits, in light of her prior statements to the police, the trial judge afforded her an opportunity to consult with an attorney. After consultation, she asserted her Fifth Amendment privilege against self incrimination and did not testify. Furthermore, she stated at the hearing that she would likely assert her Fifth Amendment right in any future proceeding on Appellant's behalf.
While we find that the better practice would have been for defense counsel to seek a continuance in order to procure Donna's appearance at trial, based upon her contradictory statements and her refusal to testify at the new trial hearing, we have no indication from the record as to what her testimony would have been had she appeared and testified, or even if she would have testified. Without knowing the content of Donna's testimony, or even whether she would have testified, there is no basis for this court to find prejudice and that there is a reasonable probability that the result of the trial would have been different if her testimony had been presented.[27]
Consequently, we find that Appellant's sixth assignment of error is without merit and is hereby overruled.
 Assignment of Error VII The combination of the aforementioned errors are sufficient to call into question the validity of the verdict, preventing the appellant from obtaining the fair trial guaranteed by the Fifth and Sixth Amendments to the U.S. Constitution as made applicable to the states by the Fourteenth Amendment, and Article One, Sections Ten and Sixteen of the Ohio Constitution, requiring reversal of the appellant's conviction and a new trial.
In his seventh assignment of error, Appellant asserts that, singularly, the aforementioned assigned errors may not rise to the level of prejudicial error; however, his conviction should be reversed because the cumulative effect of the errors deprived him of a fair trial. The Ohio Supreme Court has recognized the doctrine of cumulative error by holding that
 a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal.[28]
Because we have found no error in the trial as claimed, harmless or otherwise, the doctrine is not applicable;[29] consequently, Appellant's seventh assignment of error is overruled.
 Assignment of Error IX The trial court erred to the prejudice of Defendant-appellant by denying Defendant-appellant's motion for new trial [sic].
Appellant contends in his final assignment of error that the trial court erred by denying his motion for a new trial, pursuant to Crim.R. 33. Specifically, Appellant claims that he should have been granted a new trial based upon prosecutorial misconduct[30] during his trial and newly discovered post-trial evidence.[31] Because we have already discussed Appellant's allegations of prosecutorial misconduct in his fifth assignment of error, we decline to grant a new trial on the basis of our previous rationale.
To warrant granting a motion for a new trial, based on the ground of newly discovered evidence, it must be shown that the new evidence 1) discloses a strong probability that it will change the result if a new trial is granted, 2) has been discovered since the trial, 3) is such as could not in the exercise of due diligence have been discovered before trial, 4) is material to the issues, 5) is not merely cumulative to former evidence, and 6) does not merely impeach or contradict the former evidence.[32] Furthermore, the allowance of a new trial on this basis is within the competence and discretion of the trial court, and in the absence of a clear showing of an abuse of discretion, we will not reverse the judgment.[33]
Appellant claims that the affidavits of Donna Bonds, which were acquired after trial, should constitute newly discovered evidence and justify an allowance of a new trial. We disagree and find that the trial court did not abuse its discretion in denying Appellant's request.
The trial court held, in part, that a new trial was not proper because Appellant did not exercise due diligence in attempting to secure Donna Bonds as a witness before trial, which was evident by Appellant's failure to request a continuance in order to locate her. We agree. Where a party is given reasonable cause to believe that favorable and available evidence exists, it is his duty, in the exercise of due diligence, to seek a continuance, if necessary, to investigate and to produce such evidence; a failure to do so will preclude the granting of a new trial on the basis of newly discovered evidence when it is recovered after the close of trial.[34] Herein, Appellant was aware of a potential alibi witness prior to trial; however, while a subpoena was issued, albeit under the wrong name and address, Appellant did not seek a continuance in order to secure Donna Bond's testimony at trial. While Appellant claims that he could not have discovered through due diligence what Donna would testify to based upon alleged intimidation of Donna by the police, there is no requirement that the testimony be elicited prior to trial but that due diligence was exercised in an attempt to secure the evidence. In the absence of a request for a continuance, we find that Appellant did not exercise due diligence in attempting to find the evidence prior to trial.
We further find, in light of Donna Bond's conflicting statements in her affidavits and her statements to the police, and her assertion at the new trial hearing that she would likely assert her Fifth Amendment right against self incrimination in any future proceeding with regards to this case, that there is not a strong probability that her testimony would change the result if a new trial is granted. For these reasons, we find that the trial court did not abuse its discretion in denying Appellant's motion for a new trial.
As a final matter, Appellant argues in his reply brief that the trial court improperly allowed Donna Bonds to assert her privilege against self-incrimination without first determining whether she was mistaken about the potential for actual incrimination. Because Appellant did not object to this alleged error in the trial court and, in fact, contested the State's request for that very procedure, he has waived the issue upon appeal.
Accordingly, Appellant's ninth assignment of error is hereby overruled.
Having found no error prejudicial to the Appellant herein, in the particulars assigned and argued, the judgment of the trial court is affirmed.
Judgment affirmed.
HADLEY, J., concurs.
[1] State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus.
[2] State v. Thompkins (1997), 78 Ohio St.3d 380, 386; State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith
(1997), 80 Ohio St.3d 89.
[3] R.C. 2903.01(B).
[4] R.C. 2909.02(A)(2).
[5] R.C. 2911.11(A)(1).
[6] Jenks, 61 Ohio St.3d at 272.
[7] Id. at 273.
[8] State v. Martin (1983), 20 Ohio App.3d 172, 175; Thompkins,78 Ohio St.3d at 387.
[9] Id.
[10] State v. Awkal (1996), 76 Ohio St.3d 324, 331.
[11] Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd. (1992), 63 Ohio St.3d 498, 506.
[12] Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, 615, citingGalindo v. Riddell, Inc. (1982), 107 Ill. App.3d 139. See, also,Leichtamer v. Am. Motors Corp. (1981), 67 Ohio St.2d 456, 473.
[13] Miller, 80 Ohio St.3d at 615; Leichtamer, 67 Ohio St.2d at 473;State v. Aliff (Apr. 12, 2000), Lawrence App. No. 99CA8, unreported.
[14] Miller, 80 Ohio St.3d at 615; Leichtamer,67 Ohio St.2d at 473.
[15] Evid.R. 403; State v. Allard (1996), 75 Ohio St.3d 482, 500;Jacobs v. Gupta (May 11, 2000), Allen App. No. 1-99-85, unreported; Statev. Sargent (Mar. 9, 1998), Butler App. No. CA97-05-097, unreported.
[16] See, e.g., State v. Wilson (1996), 74 Ohio St.3d 381, 390.
[17] Crim.R. 16(B)(2).
[18] State v. Lott (1990), 51 Ohio St.3d 160, 167.
[19] State v. Treesh (2001), 90 Ohio St.3d 460, 464, citing State v.Smith (1984), 14 Ohio St.3d 13, 14.
[20] Treesh, 90 Ohio St.3d at 466, citing State v. Grant (1993),67 Ohio St.3d 465, 482.
[21] Smith, 80 Ohio St.3d at 111.
[22] State v. Williams (1986), 23 Ohio St.3d 16, 20, citing Lockett v.Ohio (1978), 438 U.S. 586, 595; State v. Lane (1976), 49 Ohio St.2d 77,86, vacated on other grounds (1978), 438 U.S. 911; State v. Clemons
(1998), 82 Ohio St.3d 438, 452.
[23] Clemons, 82 Ohio St.3d at 452, citing State v. D'Ambrosio
(1993), 67 Ohio St.3d 185, 193.
[24] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
[25] Id. at paragraph three of the syllabus.
[26] State v. Waddy (1992), 63 Ohio St.3d 424, 433, superseded by state constitutional amendment on other grounds in State v. Smith (1997),80 Ohio St.3d 89.
[27] Cf. State v. Cooperrider (1983), 4 Ohio St.3d 226, 228. See, also, State v. Evans (Mar. 21, 1988), Preble App. No. 87-08-023, unreported; State v. Ray (Dec. 22, 1993), Summit App. No. 16050, unreported; State v. Rhoden (May 20, 1997), Pike App. No. 96CA589, unreported; City of Lakewood v. Glaser (Jan. 15, 1998), Cuyahoga App. No. 71668, unreported; State v. Williams (Sept. 17, 2001), Cuyahoga App. No. 76816, unreported.
[28] State v. Garner (1995), 74 Ohio St.3d 49, 64. See, also,State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus.
[29] Garner, 74 Ohio St.3d at 64.
[30] Crim.R. 33(A)(2).
[31] Crim.R. 33(A)(6).
[32] State v. Petro (1947), 148 Ohio St. 505, syllabus.
[33] State v. Tijerina (1994), 99 Ohio App.3d 7, 11, citing State v.Hill (1992), 64 Ohio St.3d 313, 333.
[34] Domanski v. Woda (1937), 132 Ohio St. 208, paragraph four of the syllabus; State v. Sheppard (1955), 100 Ohio App. 399, 405; Rothstein v.Rothstein (1958), 109 Ohio App. 234, 240-41; State v. Gregory (Dec. 16, 1981), Hamilton App. Nos. C-800915, C-810223, unreported; State v. Davis
(Apr. 21, 1983), Cuyahoga App. No. 45309, unreported; State v. Hall
(Aug. 18, 2000), Hamilton App. No. C-990639, unreported, appeal not allowed by (2000), 90 Ohio St.3d 1481.